SOUTHERN GARMENT MFRS. ASS'N, Inc., et al. (BIG ACE MFG. CO. et al., Interveners) v. FLEMING, Adm'r, Wage and Hour Division, etc.

No. 7709.

United States Court of Appeals for the District of Columbia.

Decided June 30, 1941.

---

Albert F. Beasley, of Washington, D. C. (W. Gordon McKelvey, of Nashville, Tenn., on the brief), for petitioners.

Irving J. Levy, Asst. Sol., of Washington, D. C. (Gerard D. Reilly, Sol., and Louis Sherman, Jacob D. Hyman, and Louis P. Haffer, Attys., United States Department of Labor, all of Washington, D. C., on the brief), Robert S. Erdahl and David Cobb, both of Washington, D. C., for respondent.

Before GRONER, Chief Justice, and MILLER and VINSON, Associate Justices.

VINSON, Associate Justice.

This is a proceeding to review and set aside certain wage orders for the Apparel Industry issued by the Administrator of the Wage Hour Division of the Department of Labor. The Fair Labor Standards Act of 1938,[1] the statute involved, has been rather comprehensively discussed by the Supreme Court in the recent Darby[2] and Opp Cotton Mills[3] cases. We avoid duplicating that discussion as much as possible. Presently we give the general background of how these wage orders came into existence.

Pursuant to an invitation of the Administrator, a large group of representatives of labor and industry held a preliminary conference for three days discussing the appointment of a committee. After considering the resolutions of this body, and after conducting further investigations, the Administrator appointed a committee of 48 members for the entire apparel industry. The public, the employers, and the employees each had sixteen representatives. The Apparel Committee, known as Industry Committee No. 2, and its subcommittees met on January 31, February 1, March 15, 16, and 17, May 8 and 9, June 14, 15, and 16, and August 29, 1939. Extensive evidence was taken, and briefs were received. The Committee made its

---

[1] 29 U.S.C.A. § 201 et seq. For an interesting synopsis of the legislative History see Forsythe, Legislative History of the Fair Labor Standards Act (1939) 6 Law & Contemp. Prob. 464.

[2] United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430.

[3] Opp Cotton Mills, Inc., v. Administrator of Wage and Hour Division of Department of Labor, 312 U.S. 126, 61 S. Ct. 524, 85 L.Ed. 624.

report, approved by all except one member,[4] on September 27, 1939. The report contained 29 specific wage order recommendations.

After notice, hearings were commenced before a presiding officer appointed by the Administrator on November 13th. These hearings continued through January 10, 1940. There were nearly 150 witnesses. About 6,000 pages of testimony and 16 volumes of exhibits were received. Around 20 briefs from the major parties were received. Three days were devoted to oral argument before the Administrator.

The Administrator issued his findings, orders, and opinion, which covered 368 pages on May 15, 1940. He approved 27 and rejected 2 of the Committee's recommendations. The wage orders were to become effective on July 15, 1940. This court stayed the orders until final determination of the issues presented on review.

I. *Appointment of the Presiding Officer.*

The petitioners contend that the Administrator's act of appointing a person to preside for him at the hearing was an unlawful delegation of duty. They argue that the statute does not authorize such an appointment; that the legislative history shows that no such authority was intended, particularly in that it is the policy of Congress to expressly provide for a trial examiner whenever it intends for one to be employed; that authority cannot be implied from convenience and necessity, and moreover, there is no necessity here; and that the power of courts to make orders of reference is not analogous.

It is clear that the act expressly gives the Administrator power to appoint subordinates—a power which otherwise might well be implied from the amount and diversity of work such an agency is called upon to perform. The precise question is whether the Administrator can appoint a subordinate to act as the presiding officer at a hearing; is that a function which a subordinate can perform? Sensible administration would seem to call for such a practice. The practice has been approved by the Supreme Court. "Evidence may be taken by an examiner. Evidence thus taken may be sifted and analyzed by competent subordinates. * * * The requirements are not technical."[5] The petitioners retort that the Court was laying down procedural due process requirements, in this the first Morgan case, while the question here is one of statutory authorization.

In that case, the Court, however, posed this question at the outset of the discussion on this matter, " * * * what is the nature of the hearing which the statute prescribes?"[6] The petitioners in this case argue simply that the sub-delegation is not authorized, rather than that, since the appointment of a presiding officer is bad, the hearing is vitiated. But the Supreme Court in discussing the criteria of what makes the decider the hearer was necessarily treating the same fundamental problem of the functions which may be sub-delegated and those which must be exercised by the agency head. This is manifested by their question, "What is the essential quality of the proceeding under review * * *?"[7] The Supreme Court in that case may have determined that the requirements of a statutory full hearing coincided with those of due process and hence the discussion of one was the discussion of the other, but even if we assume that the decision was predicated upon procedural due process alone the Court must have regarded the statutory authorization as giving everything up to the constitutional limit under the well established rule that constitutional problems will not be treated unless necessary. Thus we come to a comparison of the Fair Labor Standards Act with the Packers and Stockyards statute under which the Court, in the Morgan case, said evidence may be taken and analyzed by subordinates.

First the language relating to the general nature of the hearing: the Packers and Stockyards Act reads, "Whenever after full hearing * * * the Secretary is of the opinion * * *, the Secretary * * * may [determine and order]"[8]; the statute now involved reads, "Upon the filing of such report [by the industry committee], the Administrator, after due notice to interested persons, and giving them an opportunity to be heard, shall by order * * *".[9] In both statutes the subject of

---

[4] One member dissented because he believed in a single minimum wage for the entire apparel group.

[5] Morgan v. United States, 298 U.S. 468, 481, 56 S.Ct. 906, 912, 80 L.Ed. 1288.

[6] 298 U.S. at page 479, 56 S.Ct. at page 911, 80 L.Ed. 1288.

[7] Id.

[8] 7 U.S.C.A. § 211.

[9] 29 U.S.C.A. § 208(d).

the sentence (the respective agency head) is directed primarily to the predicate decide and order. While "the one who decides must hear", it must be remembered that "hear" is used in the artistic sense of requiring certain procedural minima to insure an informed judgment by the one who has the responsibility of making the final decision and order. That did not necessitate the Secretary becoming a presiding officer at the hearing in the Morgan litigation, and there is no more reason for finding such a command in this part of the instant statute.

Now we compare the provisions of the statutes in respect of letting employees do some of the work. The Packers and Stockyards Act provides, "The Secretary * * * shall have the power to appoint * * * such * * *employees * * * as shall be necessary * * * ".[10] The Fair Labor Standards Act provides, "The Administrator may * * * appoint such employees as he deems necessary * * * *".[11] The Packers Act continues, "The Secretary * * * may cooperate with any department or agency * * * *".[12] And from the current Act, "The Administrator may establish and utilize such * * * agencies, * * * as may from time to time be needed."[13] The Packers and Stockyards Act further states, "The Secretary, in person or by such agents as he may designate, may prosecute any inquiry necessary to his duties under this chapter in any part of the United States."[14] Correspondingly, the Fair Labor Standards Act reads, " * * * the Administrator * * * or his duly authorized representative may exercise any or all of his powers in any place."[15] The practice of using a subordinate as a presiding officer has been approved under the Packers and Stockyards Act. The comparison of the Act presently under consideration with that one reveals no less reason and possibly even more for such a practice by the Administrator. Furthermore in the Morgan case, the Court approved the handling of functions by subordinates beyond those which the presiding officer exercised in this case. Subordinates may sift and analyze evidence.

Although the petitioners say that the Court was passing upon only the constitutional issue, they make much of the fact that the Secretary, has since requested and obtained authority to delegate the duties vested in him. The cautiousness that leads to a request for a more precise and orderly statute should not be confused with a requirement. The greater point, in this instance, is, however, that the request for and the authority given in the amendatory act is not limited to appointing a presiding officer, but extends to a delegation of the Secretary's fundamental responsibility of making the decision. Under the new Act the Secretary may appoint an officer or an employee to perform the function of determining and ordering for him.[16] This is the logical outgrowth of what the first Morgan case condemned in connection with an overworked Secretary of Agriculture.

This Act, to which petitioners have called our attention, exemplifies in bold relief the nature of the presiding officer's work in comparison with that of the Administrator. The contrast of the present intra-departmental relationship between the presiding officer and the Administrator with what is now the relationship in the Department of Agriculture, reveals the crux of the problem of what subordinates can do.

At this point the argument of Andree & Seedman, Inc., et al., petitioners in a consolidated case, becomes particularly pertinent.[17] We consider their argument now in behalf of a logical and concise discussion. They argue that the presiding officer performed work that in effect changed the functions of the Administrator from those of a trial to those of an appellate judge. Thus the presiding officer must have exercised quasi-judicial functions. The power to appoint employees includes only the right to give them ministerial work. Hence, the present delegation is bad.

With this line of reasoning we cannot agree. We are not interested in algebraic law, but we are interested in law that establishes norms adaptable to an efficient, fair way of getting work done, and that insures an informed judgment by each person in the process upon the matters which

---

10 7 U.S.C.A. § 228.
11 29 U.S.C.A. § 204(b).
12 7 U.S.C.A. § 228.
13 29 U.S.C.A. § 204(b).
14 7 U.S.C.A. § 222.
15 29 U.S.C.A. § 204(c).
16 The Secretary is limited to appointing two such men. 5 U.S.C.A. § 516a, 516b, and 516c.
17 Andree & Seedman, Inc., et al., v. Philip B. Fleming, Administrator, Wage and Hour Division, Department of Labor, — App.D.C. —, 122 F.2d 634, decided this day.

he is called upon to decide. The petitioners, Southern Garment Manufacturers Ass'n., et al., state that the presiding officer administered oaths, ruled upon the admissibility of evidence and other interlocutory matters. The petitioners, Andree & Seedman, Inc., et al., point out that he rather than the Administrator saw and heard the witnesses. Realism negatives the idea that a subordinate is to exercise no intelligence, that he must assume the role of an automaton. All that the presiding officer did by his presence was to expedite the process. All that he did by his rulings was to expedite the hearing. He made no final conclusive decisions. The petitioners have chosen to make the argument of no statutory power justifying the appointment of an employee for this type of office instead of contending that certain acts of the appointee were beyond his authority. Hence we do not know whether one iota of petitioners' evidence was excluded, any interlocutory ruling ran against them, or that credibility played any part whatsoever. The staff of the Attorney General's Committee on Administrative Procedure, which has just surveyed all of the leading agencies of the federal government, said in respect of the Wage-Hour "trial examiner", "In sum it may be stated that the Division regards the presiding officer as a monitor of the hearing and no more."[18] In the staff reporter's comments and criticisms appears this statement, "It seems very probable that the presiding officer's role is now far too limited."[19]

As we have seen, the authority to appoint employees, which is admittedly given by the statute, covers the Administrator's use of a presiding officer. To make out a case the petitioners would have had to show that the Administrator passed his responsibility to this officer in respect of determining the case. Instead it appears that the presiding officer exercised a subordinate's functions. The Administrator exercised all of the responsibilities that the statute imposes upon him. The Administrator did not unlawfully delegate to a trial examiner the duty of holding the hearing.

## II. *The Hearing.*

The petitioners contend that they were not given a full and fair hearing. The contention is predicated upon the Industry Committee advocating approval of its own report, the appearance of Wage and Hour Division employees on behalf of the Administrator and approving the Committee's recommendations, and the denial of petitioners' motion to adjourn to a southern city. The first two points are concisely and cogently answered by the Supreme Court in the Opp Cotton Mills case decided after petitioners' brief was written: "Nor can we find any error or want of due process in permitting the Industry Committee to appear before the Administrator by counsel and to offer evidence in support of its recommendations or in permitting members of the staff of the Wage and Hour Division to give testimony."[20]

We do not see how petitioners' nebulous suggestion that the Wage and Hour Division employees appeared on behalf of the Administrator adds anything to their argument which otherwise was unequivocally rejected by the Supreme Court. Apparently it is bottomed upon the idea that such persons were employees of the Administrator, but to argue that such a set up is inherently wrong is to overlook the division of personnel and functions common to many administrative agencies. It may be that better procedures can be devised, even as this agency is now trying a different system,[21] but due process or statutory "hearing" does not make a legal requirement enforceable by the courts of the abstract best.

It does not seem amiss to comment upon petitioners' argument that the Industry Committee is not an interested person and therefore cannot be heard inasmuch as the statute provides, "after due notice to interested persons, and giving them an opportunity to be heard".[22] The legal system with which we are familiar may emphasize time and again its adversary character to ferret out all ramifications of an issue, but it is not so sold on trial by battle that the adjudicator is precluded from gaining

---

[18] Att'y. Gen's. Comm. on Ad. Pro., Administration of FLSA of 1938, 77th Cong., 1st Sess. Senate Doc. No. 10, Part 1, p. 25.

[19] Ibid at p. 32.

[20] 312 U.S. 126, 154, 61 S.Ct. 524, 536, 85 L.Ed. 624.

[21] The attorneys from the Wage and Hour Division now present testimony and argument for and against the committee recommendations. 3 Wage and Hour Rep. 97.

[22] 29 U.S.C.A. § 208(d).

628

knowledge through the testimony of a disinterested witness or considering an interpretation of facts argued by an intervenor's counsel. The idea that the group which may know the most facts and can best explain their implications is not to participate because they are unable to identify themselves with either team is not overly convincing. But to become more legalistic—this statute does not say that disinterested persons may not be heard; it says that interested persons must have an opportunity to be heard.

■ The petitioners expressly state that they recognize that their third point, the denial of their motion to adjourn to a southern city, standing alone would not be sufficient cause for contending that the hearing was not full and fair. To our mind it does stand alone, and moreover, under all of the circumstances such action was not only within, but was a sound exercise of, the Administrator's discretion.

### III. The Administrator's Partial Rejection of the Committee's Report.

■ The Committee, pursuant to § 8 (c),[23] divided the apparel industry into 29 classifications or divisions. This included two divisions for embroideries, the one embracing pleating, hemstitching, and the like at 40 cents, the other, 35 cents. The Administrator placed these two classifications into one division, calling it the "Embroidery Industry". He disapproved these two recommended wage orders, holding that they were not supported by the evidence. The Committee's report also included two classifications of single pants, one containing 100% cotton fabric, the other any fabric not 100% cotton. For the former the recommended wage was 32½ cents, the latter 37½ cents. The Administrator put these two classifications into one division of the industry but retained the two wage orders.

The petitioners argue that the Administrator must approve or reject in toto the report and recommendations of the Committee. Since he made two partial modifications, he did not follow the statutory requirements and the entire wage order must fall.

At first blush these arguments appear to be entirely formalistic. It must be remembered, however, that the statute divides with some precision the work of the committees and the Administrator. The industry committee appointed by the Administrator gives the opportunity for deliberate consideration by the representatives of three groups of people whom the order will directly affect. To avoid the possibility of law making by private groups[24] the Administrator passes an independent judgment confined by the same statutory standards that are applicable to the committee upon its recommendations. If the Administrator is given a free hand in sub-dividing an industry, approving and disapproving the several recommendations and having power to reappoint committees for the divers divisions until he obtains the recommendations he wants on the evidence, he could destroy the balance contemplated by the statute. The Committee when it makes its recommendations for minimum wages for the several divisions within an industry has in mind among other things the interrelationship of the parts to the whole. The Administrator could upset this studied relationship by a partial approval. The committee might choose not to recommend a wage of 37½ cents for one branch and 35 cents for another if both were not to be adopted.

Even in light of these considerations the objection to the Administrator's action in placing the two single pants classifications into one division remains formal, for he retained the two definitions and wage orders recommended by the Committee for this part of the industry. The consideration of the disapproval of the embroidery wage orders remains.

### The Rejection of the Embroidery Recommendations.

It might be held in this case that the petitioners are not in a position to complain about the rejection of the embroidery recommendations. The petitioners apparently are not embroidery manufacturers. The Administrator specially found that the making of embroideries was a distinct industry and that the rejection of the recommendations would not in any way affect the other parts of or the other apparel industries. The petitioners have not contested these findings.

Keeping in mind however that the Administrator might always state that a part of an industry was a separate industry and that from the set up of the statute, if it requires an in toto approval or rejection, it might well be assumed that others are prej-

---

[23] 29 U.S.C.A. § 208(c).

[24] Jaffe, Law Making by Private Groups (1937) 51 Harv. L. Rev. 201.

udiced by a partial rejection, we do not hold the petitioners to as strict a showing of damage as when federal constitutional questions are raised. Moreover, this is a definitely short term statute, much of its life has gone, and the policy of reaching the 40 cent level as soon as economically feasible without substantially curtailing employment is expressly declared. Therefore we believe that a court should discuss and make its decision on this important problem as soon as a case presents the issue directly enough to avoid any semblance of an advisory opinion. As can be gathered from our discussion thus far we believe that this is such a case and that a declaratory judgment is called for in the event that it is thought that the controversy is not within the confines of a traditional litigation.

Section 8(d) provides that, after hearing, the Administrator shall approve the recommendations of the committee if they are in accordance with law, supported by the evidence, and taking into consideration the same factors as the statute prescribes for the committee, they will carry out the purposes of the section. Otherwise, he shall disapprove. If he "disapproves such recommendations, he shall again refer the matter to such committee, or to another industry committee for such industry (which he may appoint for such purpose), for further consideration and recommendations."[25]

Here, the Administrator has approved 27 classifications and wage orders and rejected 2. It must be acknowledged that the classification or definition is inextricably correlated with the wage order. This is shown by a consideration of the essence of a wage order, section 8(f),[26] and the discussion of the Supreme Court in the Opp case. "So far as the definition is open to attack, it is upon the record made before the Administrator if it there appears that the definition does not conform to the statute, or that the recommendations of the committee were based on a different definition of the industry from that finally made and so do not support an order for the industry as defined. But subject to these requirements which insure that recommendations of the committee and the order of the Administrator are based on the same definition of the industry, there is no provision of the statute preventing amendment of the definition while the matter is pending before the committee and no purpose or policy of the Act which would be served by precluding such amendments so long as the report of the committee is based on the amended definition. It is to the advantage of the administration of the Act that the completeness and accuracy of the definition should be reexamined and the definition revised with the aid of the committee at any time before its report is submitted."[27]

Here, the definitions of the wage order classifications put into effect were precisely the same before the committee and the Administrator. There were also common definitions of the two branches or separate industry not put into effect. The Administrator simply did not see evidence supporting these two recommendations.

Section 8(d) would seem to require that the Administrator approve all the recommendations or none. Before this is made a legal requirement a picture of the entire operation of the formulation and the promulgation of a wage order should be drawn. The Administrator appoints an industry committee.[28] An industry is defined to include any branch or group of industries.[29] The Administrator has a large measure of discretion in his determination of how generic the committees are to be. The committee is to deliberate. The Administrator shall submit appropriate data to the committee from time to time. It is free to gather other data.[30] The Administrator is to convene the committee from time to time. The committee is to make recommendations from time to time.[31] The committee shall recommend reasonable classifications.[32] The Administrator may approve or disapprove the recommendations. If he approves he shall put into effect wage orders which define the industries and the divisions thereof, and which carry the terms and conditions that the Administrator finds necessary to effectuate the purposes of the orders.[33] When a circuit court of appeals obtains jurisdiction, it may affirm, modify, or set aside the order in whole or part so far as applicable to the petitioner (aggrieved person).[34]

[25] 29 U.S.C.A. § 208(d).

[26] 29 U.S.C.A. § 208(f).

[27] 312 U.S. 126, 148, 149, 61 S.Ct. 524, 534, 85 L.Ed. 624.

[28] 29 U.S.C.A. § 205(a).

[29] 29 U.S.C.A. § 203(h).

[30] 29 U.S.C.A. § 205(d).

[31] 29 U.S.C.A. § 208(a).

[32] 29 U.S.C.A. § 208(c).

[33] 29 U.S.C.A. § 208(f).

[34] 29 U.S.C.A. § 210(a).

These provisions show a continuity of action. The statute does not contemplate that the wage orders for all industries or all parts of an industry shall go into effect simultaneously. They reveal that the Administrator may appoint a committee to deliberate upon a particularized section of an industry, an industry, or a group of industries. For example, he could appoint a shingle committee, a lumber committee, or a building materials committee. The committee is to make reasonable classifications and recommendations from time to time. The Administrator may approve or reject. If approved the resultant wage order may be enforced in whole or in part by the courts. If rejected the Administrator may appoint a new committee.

Now if the Administrator operating under this short term statute should appoint a broad committee such as a building materials one in order to conform with the policy of reaching the universal 40 cent wage level as rapidly as possible, and he found that the committee's recommendations on the brick industry were not supported by evidence, should the whole matter be thrown open again and much of the work already done duplicated? Here, the Administrator appointed an Apparel Committee. Under the N. I. R. A. this grouping embraced something like 30 codes of fair competition. He determines that embroidery is a separate industry and finds the recommendations unsupported. There would be no question raised if he, instead of trying to expedite matters, had appointed a committee for each of the 29 branches on which there was a recommendation and then proceeded to approve the reports of 27 committees and reject 2. Just because the Administrator attempted to follow a plan of workable administration and the wise policy of putting related industries under one committee, should the statute be read so as to make possible a substantial bogging down?

Section 8(d) was probably drawn in terms of approve or reject in order to prevent the work of the committees from being regarded as merely advisory. The important considerations would seem to be whether the Administrator approved the identical wage recommended and whether he retained the precise definition of the group to which it applied.[35] Both were done here.

Of course it can be argued that the Administrator originally defined the Apparel Industry as including all apparel industries. The Committee acted and reported under the definition. And now the Administrator defines the Apparel Industry as including all apparel industries except the embroidery industry. Hence he has not approved the recommendations as submitted.

The Administrator, however, is the ultimate definer of what is an industry. And here, there is not one, but many wage orders for the apparel industry. The industry has been broken down so that different branches have different wage orders. The orders approved apply exactly to what the committee applied them. The point made is that because one branch of the industry did not receive a wage order, those which did are without effect, but this does not follow for that could very well be the situation if a separate committee had been at work.

Section 8(c) provides that the committee shall not classify so as to give one group in an industry a competitive advantage and that the committee and the Administrator shall consider among other relevant factors competitive conditions.[36] It would seem

---

[35] Senator Thomas said in submitting the conference report to his legislative body: "The Administrator may accept or reject the recommendations of an industry committee, but *he may not put into effect minimum wages other than those recommended* to him by an industry committee. The Administrator may accept the recommendations * * * only if he is satisfied, after a hearing, that they are made in accordance with law, are supported by the evidence. * * * It should be noted that this careful and deliberate procedure has a twofold advantage. On the one hand, it insures that *no minimum rate shall be established by administrative action that has not been carefully worked out by a committee* principally drawn from the industry itself. On the other hand, it insures that *no minimum wage rate shall be put into effect* by administrative action *which has not been found to be in accordance with law by an independent, responsible administrative officer* of the Government, *exercising an independent judgment on the evidence* after a legal hearing. There is certainly no illegal delegation here." (Ital. supplied) 83 Cong. Rec. 9164. The italicized portions have certainly been followed here. Of course it can be seen that much of Senator Thomas' remarks was directed toward the constitutional issue not now involved.

[36] 29 U.S.C.A. § 208(c) and (d).

that often the committees would be appointed along each industrial line; then the Administrator alone would be in a position to put in effect wage orders that took into account the competitive conditions between industries. He is the one in position to keep some semblance of balance in the country wide minimum wages as they approach the universal 40 cent level as rapidly as possible without substantial curtailment of employment. The significance of a 32½ or a 37½ cent wage is chiefly in relation to another lower or higher wage. In determining whether the lumber industry should pay a 37½ cent wage, the fact that the brick industry is paying 37½ cents would appear to be relevant. The Administrator is in the position to make this relevant factor effective. The brick committee and the lumber committee might consider the other field but they could not correlate the wage orders. The Administrator could not set a wage different from the one recommended but he could reject it with suggestions to the committee or a new one that the competitive condition ought to be taken into consideration. This shows the desirability of the broad committee. But if the Administrator appoints such a committee, is it reasonable to say that he abdicates his power of defining industries or that he must accept the entire report to avoid delaying all wage orders recommended? He works on this subject matter day in and day out while the committee may just be called for the occasion.

Thus under the facts of this case we find no error in approving 27 recommendations and rejecting 2.[37] We pass no opinion upon the situation where a committee has been appointed along a narrow industrial line and proceeds to make recommendations upon particular branches and the Administrator makes only a partial approval. It is possible that under such circumstances the Administrator could break down reports and appoint new committees until in effect he had destroyed the balance of functions contemplated by the statute.

In this interpretation it has not been appropriate to use that expression that a statute must be construed so as to avoid absurdity. In addition the Congressional intent is not explicit either way. Section 8 (d) is probably more plausibly interpreted as requiring in toto approval. But that subsection must not be read alone, and we feel that the interpretation given after considering the whole statute makes for a more successful and workable Act.

### IV. Classifications.

Petitioners contest the classification that places men's summer suits into the 40 cent division of men's tailored clothing. They argue that there is an inherent difference in the nature of the article, the way that it is manufactured, and the marketing. They point out that past classifications in the industry have differentiated between wash and tailored suits. Petitioners also contest the classifications for single pants which differentiate between those that are made of 100% cotton fabric, and those that have any amount of other fabric.[38] They present several considerations the gist of which are that the distinction is based upon no real difference and that it will be difficult to operate under the classifications as made, and therefore the classifications cannot stand. Undoubtedly there are differences between the items in the first classification as there are similarities in the items in the two second classifications; the Administrator has shown similarities and differences vice versa to the petitioners. All items can be individualized and differentiated, or very generic categories can be made. When one begins to generalize or group it is a matter of judgment as to how large the group should be and where the lines ought to be drawn.

---

[37] Att'y. Gen's. Comm. Ad. Pro., Administration FLSA of 1938, 77th Cong., 1st Sess. Senate Doc. No. 10, Part I, p. 9, fn. 23, pp. 20–1; Comment (1941) 35 Ill.L.Rev. 840, 856–7; Golding, The Industry Committee Provisions of the Fair Labor Standards Act (1941) 50 Yale L.J. 1141, 1157, fn. 57.

Elmer F. Andrews, while he was Administrator made this statement, "The Administrator cannot amend or revise the recommendation or put it into effect only so far as he thinks it is supported by the economic data, nor can he increase or diminish the recommendations as to the wage rate." 1 Wage and Hour Rep. 286.

[38] The definitions and wage orders are: (1) a minimum wage of 32½ cents in the "manufacture of single pants made of 100 percent cotton fabric; overalls; overall jackets (regardless of type of fabric used in lining); men's, boys' and children's coveralls; and work shirts;" (2) a minimum wage of 37½ cents in the "manufacture of men's and boys' separate trousers or pants, breeches and knickers from any fabric except that consisting of 100 percent cotton;".

For example, in respect of the single pants classifications the petitioners admit that a line of demarcation should be drawn but other than where it is. The issue is one of error in classification. An analysis of our appellate function will show that the problem is one of easy resolution.

Some time back this issue arose chiefly when the court was reviewing acts of a state legislature enacted pursuant to the police power or the statutes of Congress carrying out some social policy under its delegated powers. The scope of judicial review was developed in terms of arbitrariness or a reasonable relation between method and end. The legislative body never had to choose the best classification; the issue was whether any conceivable set of facts showed a reasonable basis for the grouping chosen. The question was a constitutional one of either due process or equal protection.

Then legislatures began laying down general standards and employing agencies to fill in the interstices. Ofttimes the agencies had to make classifications. Sometimes "reasonable" was written into the statute; otherwise it was usually implied. The issue could then be statutory or constitutional. (Petitioners suggest both here.) When statutory, the added questions of whether the agency followed the procedure and considered the factors that the legislature required it to do in reaching its classification were often presented. Here, the petitioners talk of the elements of competitive conditions and curtailment of employment. An analysis of the arguments and discussion shows that petitioners are not saying that these elements were not considered as the statute requires, but rather that they disagree with the conclusions reached. Hence the entire issue is simply one of alleged error in the substantive classification.

Now it should be remembered that the legislative could meet and without any consideration or deliberation put a and b into class m and c into class n. And when the problem got to the courts the issue would still be, is the classification arbitrary, or is there any relation between method and end, and not is the grouping wise. If the legislature instead of acting impromptu carries out committee hearings and investigation, debates the problem on the floor, and then makes findings of fact in the statute,[39] should not the court demand a stronger case to say that there is an arbitrary classification?

Here there are even more safeguards in the process that leads to the final substantive conclusion. The Committee investigated, carried on informal hearings, deliberated and argued, and then made definite recommendations. The Administrator conducted a formal hearing; all relevant evidence was admitted; witnesses were subject to cross-examination; arguments were made on both or all sides. Then the Administrator found in favor of the recommendations upon the evidence adduced. The findings are more specific than a legislature makes in a statute and are adopted after hearing the interested parties on the particular wage order. The findings must find support in the record made—and that record may be brought to a court for scrutiny.

The scope of judicial review should depend largely upon the adequacy of the preceding process.[40] Here the process was fair and complete. The Committee and the Administrator did work that was authorized by Congress and they did it the way that body directed. The Committee heard evidence and deliberated. Its report went to the Administrator. There, the proceeding was upon narrow, well defined issues; the consideration was detailed; the affected parties or their representatives were present; specific wage orders resulted. These elements, inter alia, caused the Supreme Court, in the Opp case to call this proceeding judicial in character. A court, under such circumstances, should hesitate long before nullifying the resultant classification.

 It is easy now to understand why the Administrator claims that the issue is only one of substantial evidence to support the finding, but further claims that if the petitioners' statement of the issue that it is a mixed question of law and fact is correct, there is, nonetheless, no justification for reversal. Assuming that the statutory language "reasonable classification" presents one of those unhappy questions of mixed law and fact, it must be remembered that there are questions of mixed law and

---

[39] See the findings in this Act. 29 U. S.C.A. § 202(a). Compare the declaration in the Bituminous Coal Act, 49 Stat. 991, 992, and its treatment in Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160.

[40] Tollefson, Administrative Finality (1931) 29 Mich.L.Rev. 839, 844–6.

fact, and then there are questions of mixed law and fact. It cannot be doubted under any functional line of reasoning that the big ingredient in reasonable classification is the factual one. Contrast the question of mixed law and fact where a court is asked to decide whether Congress gave the Interstate Commerce Commission power over interurbans when it gave that agency power over railways. In the type of mixed question that we have presently before us, the appellate judgment is practically if not identically limited to the same considerations as whether an ordinary finding of fact is supported by substantial evidence. Under this test, we have no doubt, after a consideration of the arguments, briefs, and the parts of the record brought before us, that the Administrator's classifications of men's wash suits with men's tailored clothing and of single pants into 100% and not 100% cotton fabric must be approved.

### V. Regional Differentials.

Petitioners contend that regional differentials for the southern and southwestern manufacturers should have been made. They claim that these manufacturers, who produce on the whole the cheaper cotton clothing, should be given regional differentials based upon competitive conditions like railway rates and locations of markets.[41]

Section 8(b) provides that the Committee shall recommend the highest minimum wage, with due regard to economic and competitive factors, which "will not substantially curtail employment *in the industry.*" There can be little doubt that "in the industry" means the industry on a nation-wide geographical basis.[42] Section 8(c) then provides that competitive conditions among other relevant factors shall be considered but no classification shall be made "*solely on a regional basis*". Section 8(d) states that the Administrator is to take into consideration the same factors as are required of the committee.

Petitioners do not dispute that competitive conditions and the possibility of a regional classification were considered. The weight to be given competitive conditions and other relevant factors is a matter of administrative judgment and as such was expressly approved by the Supreme Court in the Opp case. Petitioners' brief, written before that decision, is in accord stating that the question is the Administrator's abuse of discretion. If anything, this limits the scope of judicial review even more than the test for error in classification that we have just discussed. We found substantial evidence to support the classifications made. We now find no abuse of discretion. Even if the test were: is there substantial evidence to support the rejection, we still would affirm the Administrator's action because there is that substantial evidence in this record.

### VI. Feasibility of the Classifications.

In respect of the application of the classifications in the factories petitioners raise two problems. (1) The same employee will often work on garments under different wage orders within the week, day, or hour. (2) The same garment can conceivably come under more than one classification.

As petitioners developed these two points we were reminded of the agile law professor who presents difficult cases between two recognized rules of law, an exercise more worthwhile in its stimulation of the imagination than in the administration of a statute with a significant social policy. On the first problem of the employee working on garments under two different wage orders the petitioners offer the example of the sweeper. His broom hits a piece of all cotton fabric and before the stroke is finished it moves a little fabric with one percent rayon. We are confident that the same amount of imagination can control this parade of troubles.

The first problem will be solved in large part by the segregation of work. Petitioners contend that this is impossible. Any alteration of the system to which one is accustomed often appears to be an impossibility. Under the stimulus of these wage orders we dare say that many impossibilities

---

41 This is a corollary to the argument that the classifications of wash with tailored suits and of semi-dress with dress pants (another way of stating the 100% —not 100% cotton fabric classifications) were arbitrary. If putting those predominantly cotton fabrics into the higher brackets was a proper classification, then petitioners counter with the claim for regional differentials.

42 Compare, Comment (1941) 35 Ill.L. Rev. 840, 844–7; Golding, The Industry Committee Provisions of the Fair Labor Standards Act (1941) 50 Yale L.J. 1141, 1142–8.

will be shortly actualities. The habitual has a strong appeal to the human being. The new will always jar before adjustment is made.

A little experience in administration and a few interpretive regulations will clear up most of the problems. The fact that the Administrator has already altered the rule on work done under two different orders shows that it is under constant study.[43]

Naturally a few jobs probably cannot be segregated, but that is not fatal. The non-segregable work has not been shown to be a particularly material factor. These orders are establishing only the minima between 30 and 40 cents and the statute provides that before long the 40 cent wage will be practically universal.[44] In this light how significant is it that a man doing one of the bits of work that is not segregable receives 37½ rather than 32½ cents? Congress recognized that in some instances there would be hardships,[45] but it adopted the policy that it is better that way than having many working for indecent wages.

Under the second problem of garments coming under more than one classification, petitioners point to two situations. Pants of all cotton fabric are under a 32½ cent wage order. "Sports pants" are under a 40 cent wage order. Some pants under a 37½ and some under a 32½ cent wage have matching belts. Belts are under a 40 cent wage. The definitions themselves show that petitioners are not confronted with as serious a problem as they picture.[46]

Petitioners point to the criminal provisions. The confused law abiding employer they picture has no need for worry on this score. The violations must be willful to invoke the criminal provisions of the statute.[47] A problem of borderline application and a dislike for the orders remain separate issues.

Affirmed.

---

43 3 Wage and Hour Rep. 210, 335–6.

44 29 U.S.C.A. § 206.

45 "It [the bill] is an attempt to begin to meet and not to avoid some of the most vital problems of American economic life. In doing this, a few may suffer some inconvenience, and possibly financial loss, for a short time, but the fact that a tremendous number of injustices will be cured by the bill fully justifies the inconvenience and even the loss. There never has been, and possibly never will be, a law passed the adjustment to which has not caused some inconvenience. The committee recognizes this and it has worked many weeks considering this bill in its endeavor to be fair and just to all." H. R.Rep. No. 1452, 75th Cong., 1st Sess. (1937) 8. See also, Sen.Rep. No. 884, 75th Cong., 1st Sess. (1937).

46 The 32½ cent pants definition reads: "The manufacture of single pants made of 100% cotton fabric; overalls; overall jackets (regardless of type of fabric used in lining); men's, boys' and children's coveralls; and work shirts". The sportswear definition reads: "The manufacture of men's, women's and children's sportswear and other odd outerwear, including windbreakers, lumberjacks, mackinaws and mackinaw coats, melton jackets, blanket-lined and similar coats, leatherette coats and jackets, hunting coats and vests, riding clothing, ski-suits, and snow-suits (except children's ski-suits and snow-suits), and similar garments *not elsewhere specified* in wage orders relating to the apparel industry as defined, from any woven materials or from purchased knitted materials". (Italics supplied). The belt definition reads: "The manufacture of men's, boys', women's, misses' and children's *separate* belts from leather, imitation leather, or other material or fabric". (Italics supplied.)

47 29 U.S.C.A. § 216(a).