**KFC NATIONAL MANAGEMENT CORP., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 821, Docket 73-1982.**

United States Court of Appeals, Second Circuit.

Argued March 29, 1974.

Decided May 8, 1974.

Jay S. Siegel, Hartford, Conn. (Siegel & O'Connor, Hartford, Conn.), for petitioner.

Alan David Cirker, Atty., NLRB (Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Michael S. Wolly, Atty., NLRB, Washington, D. C., of counsel), for respondent.

Before KAUFMAN, Chief Judge, and SMITH and ANDERSON, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

KFC National Management Corp., ordered by the National Labor Relations Board (204 N.L.R.B. No. 69) to bargain with a union certified as representative of its employees petitions for review of the order and the Board cross-petitions for enforcement. Review granted. Cross-petition for enforcement denied.

This petition for review of an unfair labor practice decision raises the troublesome question of delegation of authority in administrative decision making. The genesis of the petition, was a representation election contested by the employer, KFC, on grounds of pro-union activity of supervisory employees. The NLRB Regional Director, to whom KFC protested, conducted an *ex parte* investigation into the company's claims and concluded that they had "no merit" and that therefore the union should be certified as the duly-elected bargaining representative.

Dissatisfied with both the Director's findings and his failure to conduct an adversary hearing, KFC petitioned the Board for review. On September 7, 1972—approximately two weeks after the petition was filed—KFC's counsel received a brief telegram informing him that the request had been denied "as it raises no substantial issues warranting review." The telegram was signed, "By direction of the Board." A further petition for reconsideration was similarly telegraphically denied, "as lacking in merit"—again "By direction of the Board."

When KFC continued to refuse to bargain, this unfair practice charge was filed. In its answer to the complaint, KFC again pressed its objections to the election and asked for a full hearing on its claims. In addition, the company for the first time challenged the denials of review and reconsideration on the grounds that the "Board" had in fact been composed of but one Board member and two staff assistants.[1]

In its decision on the unfair practice charge, the Board—now concededly composed of three official members—refused to reconsider the Director's decision relying on its "no relitigation" rule, and categorically rejected KFC's procedural objection as an unjustified intrusion into its decision-making process.[2]

1. For the first time in this review petition the Board contends that petitioner is barred from raising this procedural claim because it failed to object to the "Board's" composition at the time it sought review and reconsideration. We cannot agree. While it is true that objections to administrative procedures must be timely made with the agency, the rule is only intended to preclude parties from raising their objections for the first time in the reviewing courts. *See, e. g.,* NLRB v. Ra-Rich Mfg. Corp., 276 F.2d 451, 455 (2d Cir. 1960); NLRB v. Rexall Chemical Co., 370 F.2d 363, 365 (1st Cir. 1967); NLRB v. Rod-Ric Corp., 428 F.2d 948, 950 (5th Cir. 1970), cert. denied, 401 U.S. 937, 91 S.Ct. 922, 28 L.Ed.2d 216 (1971).

Here an objection was made to, and ruled upon by, the Board before it was presented to this court. Moreover, it is difficult to see how these objections could have been made earlier given the fact that following Board practice, the motions for review and reconsideration were neither presented to, nor decided by, the "Board" in person. We therefore believe that the objections first presented a few months later to the Board considering the unfair practice charge were timely.

2. "Respondent also seeks, by answer, to probe the internal processes of this Board, by alleging that, on information and belief, no quorum of the Board was present when Respondent's Request for Review and Motion for Reconsideration in the underlying representation case were acted upon by the Board. Respondent does not, nor indeed can it, assert that the Order issued in the name of the Board denying the Request for Review and Motion for Reconsideration were not duly authorized by action taken by the Board. While quite su-perfluous, lest there be any doubt by any reviewing court which might consider this proceeding, we record here and now that said Orders were authorized by this panel to be issued by the Board's Executive Secretary. Beyond that, Respondent has neither right nor privilege to inquire. Neither the mental nor internal administrative processes of an administrative agency may be probed by a party to the proceedings, and no Board Member or other official may be called upon to testify in any hearing designed as a fishing expedition into those processes. Morgan v. U. S. [United States v. Morgan], 313 U.S. 409, 422, [61 S.Ct. 999, 85 L.Ed. 1429]."

The Board continued:

"Whether there was a quorum of Board Member [sic] present at any formal meeting of this panel which may have been called for purposes of oral discussion of the Request for Review and Motion for Reconsideration submitted by the Respondent is, in any event, of no legal import. For this Board, like other administrative agencies, may properly act upon such matters with or without a formal meeting of its Members. Or, if the agency so chooses, its Members may decide that they would be aided by the benefit of discussions or consultations between one or more Members and/or with persons, serving on any Board Member's staffs. It is now clear that administrative agencies, like most courts of appeals in certain cases, may decide matters by notation and with no meeting at all. As was said in TSC Motor Freight Lines, Inc. v. United States, 186 F.Supp. 777, 786; affd. in Heirin [Herrin] Transportation Co. v. United States, 366 U.S. 419 [81 S.Ct. 1356, 6 L.Ed.2d 387] (1961):

As part of this petition for review of the Board's unfair practice order, KFC made a motion for a supplemental list of materials including,

> All documents, papers and records, including agenda memos, case summaries, etc. of the National Labor Relations Board and particularly members Miller, Fanning, and Jenkins, their agents, employees, attorneys and assistants, and in particular any such documents, papers and records in the Review Section of the Board under the supervision of Gilbert Rosenberg, relating to consideration of the Employer's Request for Review.

.　　.　　.　　.　　.　　.

On October 17, 1973, this court denied the motion, *except* "to the limited extent" of requiring "that the Board shall serve and file a detailed statement showing the extent and date of the participation of members Miller, Fanning and Jenkins in the consideration of the Employer's request and motion. . . ." The Board responded with an affidavit from its Executive Secretary stating:

> Member Jenkins was personally present and Chairman Miller and Member Fanning were each represented by an attorney assistant employed

on his respective staff who had been authorized to cast a vote for him at the said agenda. The vote at the agenda was unanimous to deny review.

From its own argument—both written and oral—we have further learned that the authorizations referred to were quite general in nature: In the normal course of events, Board members seldom discuss individual cases with their assistants prior to these voting sessions. There is, apparently, a one-day period between the votes and the filing of decisions, but there is no evidence that the members normally review the votes cast by their staff assistants. The Board has represented—and we have no reason to doubt—that particularly difficult or significant cases receive the individual attention of the members either before or after their votes are cast by their proxies. But there is no suggestion that such was the case here: Indeed it is the Board's position that this case—like the vast majority of review petitions [3]—was so routine that it was well suited to this general delegation approach.[4]

## I.

■ The question then is whether this virtually complete delegation com-

---

> The statute does not specifically provide that administrative action be taken concurrently by the deciding members in a formal meeting and we decline to impose such a requirement."

3. In Fiscal Year 1972 only 176 representation cases were decided by the Board—1.3% of all cases filed and 7.9% of those considered by the Regional Directors. Thirty-Seventh Annual Report of the National Labor Relations Board 240 (1972).

4. This description of Board practice in the representation context will come as no surprise to those knowledgeable in labor law. In 1967, Professor William Murphy—a labor law specialist reporting on a year as "Professor-in-Residence" with the Board—described the process:

> Representation (R) cases are handled quite differently at the Board from [unfair practice] cases. . . . The Requests for Review are handled by a special unit of about ten attorneys drawn from the staffs of all five Board members.

Each request for review is studied carefully by a legal assistant and a supervisor, and an oral presentation is made to a three-man panel which decides whether or not to grant review. This panel is composed of one Board member and a senior attorney from the staff of two other Board members. The Board members rotate this assignment every two months. The head of the unit notifies the Board member when he has a group of cases ready for reporting, and the panel meets two or three afternoons a week at the convenience of the Board member.

Significantly, Professor Murphy added:

> Although the R case work of the Board is not as dramatic and newsworthy as unfair labor practices are, there are many people who consider it more important in a practical, or bread-and-butter, sense.

Murphy, The National Labor Relations Board —An Appraisal, Proceedings of the Thirteenth Annual Labor Law Institute, Southwestern Legal Foundation Nov. 2–3, 1967, 113, 132–33 (1968).

ports with the requirements of the National Labor Relations Act and of administrative due process in general.

Inquiry into the statutory requirements of the National Labor Relations Act should begin with a bit of legislative history. Until the Landrum-Griffin Act of 1959, the Board was directly responsible for each and every representation decision. This tremendous burden—over 10,000 cases in 1959 [5]—prompted Congress to amend the Act to permit delegation of those decisions to the Board's Regional Directors—subject to discretionary review by the Board:

> The Board is also authorized to delegate to its regional directors its powers under section 159 of this title to . . . certify the results [of bargaining elections], except that upon the filing of a request therefor with the Board by any interested person, the Board may review any action of a regional director delegated to him under this paragraph. . . .

29 U.S.C. § 153(b).

In 1961 the Board exercised this authority by delegating representation matters subject to review by the Board on four different grounds:

> (c) The Board will grant a request for review only where compelling reasons exist therefor. Accordingly, a request for review may be granted only upon one or more of the following grounds:
>
> (1) That a substantial question of law or policy is raised because of (i) the absence of, or (ii) a departure from, officially reported Board precedent.
>
> (2) That the regional director's decision on a substantial factual issue is clearly erroneous on the

record and such error prejudicially affects the rights of a party.

> (3) That the conduct of the hearing or any ruling made in connection with the proceeding has resulted in prejudicial error.
>
> (4) That there are compelling reasons for reconsideration of an important Board rule or policy.

29 C.F.R. § 102.67(c).

Section 102.67 makes it clear that the decision on whether or not to grant such review is also to be made by the Board. *See* 29 C.F.R. § 102.67 (e, f). While there is a provision for automatic consideration of cases referred to the Board by the Regional Directors, 29 C.F.R. § 102.67(h), there is no converse language in either the statute or regulations suggesting that the Regional Director, or any other non-member, can preclude Board review.

Thus as the Board concedes, it, and it alone, had to rule on KFC's review petition. And as is further undisputed, such Board action could be taken by no fewer than two members acting as a quorum of a three-member panel. 29 U.S.C. § 153(b). Thus the real question is whether the two absent members here could legally authorize their staff assistants to vote in their place.

Here again legislative history is somewhat instructive. In 1947 a Congress concerned with excessive "institutional" decision making by the NLRB—and particularly the rather intimate relationship between the trial examiners initially deciding cases and the corps of staff attorneys advising the Board members on their review—amended the National Labor Relations Act to provide for more independent, personal adjudication.[6]

---

5. In Fiscal Year 1960 the Board decided 2415 representation cases out of over 10,000 filed. Twenty-Fifth Annual Report of the National Labor Relations Board 188 (1961).

6. The Board may not employ any attorneys for the purpose of reviewing transcripts of hearings or preparing drafts of opinions except that any attorney employed

for assignment as a legal assistant to any Board member may for such Board member review such transcripts and prepare such drafts. No trial examiner's report shall be reviewed, either before or after its publication, by any person other than a member of the Board or his legal assistant, and no trial examiner shall advise or consult with the Board with respect to ex-

The Board, undoubtedly aware that this portion of the Taft-Hartley Act expressed Congress' general distrust of review attorneys,[7] nevertheless argues that in making each assistant responsible to but one Board member, Congress intended to foster even greater delegations from member to assistant. We cannot agree. Rather we believe that the authors of Taft-Hartley were only prepared to permit the staff assistants to aid the members who were themselves to be responsible for the Board's actions. Davis, Administrative Law Treatise § 11.13 (1958). For example, while the allocation of the Board's administrative, prosecutorial, and adjudicative functions is well discussed in the Taft-Hartley conference report, there is no suggestion that the Board members could or should delegate their "quasi-judicial" function to their staff assistants beyond that of reviewing transcripts or preparing *draft* opinions. 1947 U.S.Code Congressional Service pp. 1135, 1142–1143 (1947).

Here, of course, the staff assistants of two members did far more and, more importantly, they did so without guidance from the members themselves. They did not merely assist the members; they acted in their stead. In view of the rather clear congressional distrust of staff assistants—who are, of course, neither appointed by the President nor approved by the Senate, as are the Board members, 29 U.S.C. § 153(a)—we cannot say that Congress intended, or would have approved, the general proxies issued here. We hold, therefore, that the "Board's" votes in this case fail to satisfy the two-member quorum and three-member panel requirements of the Act. 29 U.S.C. § 153(b).

## II.

The Board nevertheless argues that such delegation is supported by the law of administrative decision making, most notably United States v. Morgan, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941). In order to assess this claim, we must consider the rather tortured history of that decision. We begin with the first of no less than four *Morgan* decisions, Morgan v. United States, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936). There Chief Justice Hughes—writing for a unanimous Court—examined the essentials of a valid administrative decision-making process:

The requirement of a "full hearing" has obvious reference to the tradition of judicial proceedings in which evidence is received and weighed by the trier of the facts. The "hearing" is designed to afford the safeguard that the one who decides shall be bound in good conscience to consider the evidence, to be guided by that alone, and to reach his conclusion uninfluenced by extraneous considerations which in other fields might have play in determining purely executive action. The "hearing" is the hearing of evidence and argument. If the one who determines the facts which underlie the order has not considered evidence or argument, it is manifest that the hearing has not been given.

298 U.S. 468, 480–481.

The Court then rejected a delegation theory not unlike the one advanced here:

In such a view, it would be possible, for example, for one official to hear the evidence and argument and arrive at certain conclusions of fact and another official who had not heard or considered either evidence or argument to overrule those conclusions and for reasons of policy to announce entirely different ones. It is no answer to say that the question for the court is whether the evidence supports the findings and the findings support the order. For the weight ascribed by the law to the findings—their conclusiveness when made within the sphere of the authority conferred—rests upon the assumption that the officer who

---

ceptions taken to his findings, rulings, or recommendations.
29 U.S.C. § 154(a).

7. Davis, Administrative Law Treatise § 11.13 (1958).

makes the findings has addressed himself to the evidence, and upon that evidence has conscientiously reached the conclusions which he deems it to justify. That duty cannot be performed by one who has not considered evidence or argument. It is not an impersonal obligation. It is a duty akin to that of a judge. The one who decides must hear.

298 U.S. 468, 481.

However, the Court was quick to add—in a passage often forgotten by its critics—that this principle did not preclude every delegation of adjudicatory responsibility:

This necessary rule does not preclude practicable administrative procedure in obtaining the aid of assistants in the department. Assistants may prosecute inquiries. Evidence may be taken by an examiner. Evidence thus taken may be sifted and analyzed by competent subordinates. Argument may be oral or written. The requirements are not technical. But there must be a hearing in a substantial sense. And to give the substance of a hearing, which is for the purpose of making determinations upon evidence, the officer who makes the determinations must consider and appraise the evidence which justifies them.

298 U.S. 468, 481–482.

Two years later in *Morgan II*, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938), the Court—again with Chief Justice Hughes writing for the majority—clarified *Morgan I* in accepting the administrator's representations that he had made an independent review of the case:

In the light of this testimony there is no occasion to discuss the extent to which the Secretary examined the evidence, and we agree with the Government's contention that it was not the function of the court to probe the mental processes of the Secretary in reaching his conclusions if he gave the hearing which the law required.

304 U.S. 1, 18.

Finally, in *Morgan IV*, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429 (1941), a unanimous Court—this time through Justice Frankfurter—re-emphasized that once the threshold requirement of an individual decision is established, no further inquiry is justified:

[The Secretary's] testimony shows that he dealt with the enormous record in a manner not unlike the practice of judges in similar situations, and that he held various conferences with the examiner who heard the evidence. Much was made of his disregard of a memorandum from one of his officials who, on reading the proposed order, urged considerations favorable to the market agencies. But the short of the business is that the Secretary should never have been subjected to this examination. The proceeding before the Secretary "has a quality resembling that of a judicial proceeding". Morgan v. United States, 298 U.S. 468, 480, [56 S.Ct. 906, 911, 80 L.Ed. 1288]. Such an examination of a judge would be destructive of judicial responsibility. We have explicitly held in this very litigation that "it was not the function of the court to probe the mental processes of the Secretary". 304 U.S. 1, 18 [58 S.Ct. 773, 776, 82 L.Ed. 1129]. Just as a judge cannot be subjected to such a scrutiny, compare Fayerweather v. Ritch, 195 U.S. 276, 306–307 [25 S.Ct. 58, 67, 49 L.Ed. 193], so the integrity of the administrative process must be equally respected. See Chicago, B & Q. Ry. Co. v. Babcock, 204 U.S. 585, 593, [27 S.Ct. 326, 327, 51 L.Ed. 636].

313 U.S. 409, 422.

Thus what emerges from the *Morgan* quartet is the principle that those legally responsible for a decision must in fact make it, but that their method of doing so—their thought processes, their reliance on their staffs—is largely beyond judicial scrutiny.

This court and many others have consistently relied on *Morgan* to uphold the

use of hearing examiners in developing evidence and forming preliminary decisions,[8] the reliance on staff assistants for recommendations and draft opinions,[9] and a variety of other procedures designed to apprise those legally responsible for administrative decisions with the critical issues and evidence in a case and to record their individual determinations.[10] Concomitantly, the courts have consistently refused to issue subpoenas for the work product of such decision-making processes: Staff memos, expert reports, preliminary drafts, the oral testimony of the decision makers as to the basis for their opinions— all have been held to be beyond the purview of the contesting parties and the reviewing courts.[11]

■ But even as the courts have upheld these various practices, they have derived from *Morgan* the corollary principle that once there has been a *prima facie* demonstration of impropriety the courts will inquire into the administrative process in order to insure that the decision making was informed, unbiased, and personal. *See* Citizens To Preserve Overton Park v. Volpe, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136

(1971); Singer Sewing Machine Co. v. NLRB, 329 F.2d 200, 206–208 (4th Cir. 1964); S. D. Warren Co. v. NLRB, 342 F.2d 814, 816–817 (1st Cir. 1965), cert. denied, 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 300 (1966); NLRB v. Sun Drug Co., 359 F.2d 408, 413 (3rd Cir. 1966); National Nutritional Foods Association v. FDA, 491 F.2d 1141, 1145 (2d Cir. 1974). *See also,* T.S.C. Motor Freight Lines, Inc. v. United States, 186 F.Supp. 777, 789–790 (S.D.Tex.1960), aff'd 366 U.S. 419, 81 S.Ct. 1356, 6 L.Ed. 2d 387 (1961). Here, of course, the relevant facts have largely been admitted: The Board's counsel conceded at oral argument that there was no claim of proof that the individual members whose votes were cast by the assistants ever considered this case. Indeed the Board further admitted—and Professor Murphy's account suggests—that such individual consideration of routine cases is the exception rather than the rule.

Given these admissions, we believe the Board's reliance on our decision in Eastern Air Lines, Inc. v. CAB, 271 F.2d 752 (2d Cir. 1959), cert. denied, 362 U.S. 970, 80 S.Ct. 954, 4 L.Ed.2d 901 (1959) is simply misplaced. It is true that

8. Morgan v. United States, 298 U.S. 468, 481, 56 S.Ct. 906, 80 L.Ed. 1288 (1936); Labor Board v. Mackay Radio & Telegraph Co., 304 U.S. 333, 350–51, 58 S.Ct. 904, 82 L.Ed. 1381 (1938); Edison Co. v. Labor Board, 305 U.S. 197, 228, 39 S.Ct. 206, 83 L.Ed. 126 (1938), Southern Garment Manufacturers Ass'n v. Fleming, 74 App.D.C. 228, 122 F.2d 622, 625–626 (1941, Vinson, J.); NLRB v. Baldwin L. Works, 128 F.2d 39, 47–48 (3rd Cir. 1942); Norris & Hirshberg v. SEC, 82 U.S.App.D.C. 32, 163 F.2d 689, 693 (1947), cert. denied, 333 U.S. 867, 68 S.Ct. 788, 92 L.Ed. 1145 (1948); NLRB v. Stocker Mfg. Co., 185 F.2d 451, 452–454 (3rd Cir. 1950); Utica Mutual Insurance Co. v. Vincent, 375 F.2d 129, 131–132 (2d Cir. 1967), cert. denied, 389 U.S. 839, 88 S.Ct. 63, 19 L.Ed.2d 102 (1967); Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 379 F.2d 453, 461 (1967).

9. T.S.C. Motor Freight Lines, Inc. v. United States, 186 F.Supp. 777, 787–790 (S.D.Tex. 1960), aff'd 366 U.S. 419, 81 S.Ct. 1356, 6 L.Ed.2d 387 (1961); Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 379 F.2d

453, 461 (1967); National Nutritional Foods Ass'n v. FDA, 491 F.2d 1141, 1146 (2d Cir. 1974).

10. Utica Mutual Insurance Co. v. Vincent, 375 F.2d 129, 131–134 (2d Cir. 1967), cert. denied, 389 U.S. 839, 88 S.Ct. 63, 19 L.Ed.2d 102 (1967); Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 379 F.2d 453, 461 (1967) (proper to direct a subordinate to affix the signature of an agency member to an opinion he had approved); Sisto v. CAB, 86 U.S.App.D.C. 31, 179 F.2d 47, 53–54 (1949) (agency members need not be physically present at any one particular time to hear and consider evidence).

11. North American Airlines v. CAB, 100 U.S. App.D.C. 5, 240 F.2d 867, 874 (1956), cert. denied, 353 U.S. 941, 77 S.Ct. 815, 1 L.Ed.2d 760 (1957); Air Line Pilots Ass'n, Int. v. Quesada, 286 F.2d 319, 320 (2d Cir. 1961); Davis v. Braswell Motor Freight Lines, Inc., 363 F.2d 600, 604 (5th Cir. 1966); Bank of Commerce of Laredo v. City National Bank of Laredo, 484 F.2d 284, 287 (5th Cir. 1973), cert. filed, 42 U.S.L.W. 3490 (Jan. 22, 1974).

*Eastern Air Lines* upheld the casting of members' votes by their assistants, but as the opinion makes clear, the vote there was after consideration by and pursuant to instructions of the agency members in contrast to the votes at issue here.[12]

Here there is no evidence that the Board members considered this case or instructed their assistants on how to vote. And, of course, the votes here were final, not mere tentative tallies for the purpose of issuing a press release.[13]

■ In this regard it should be noted that the Board's subsequent statement that the votes had been "authorized" does not constitute a ratification of the prior proxies: The Board in no way suggests that it has reconsidered the *merits* of the review petition, but rather only that it issued the staff assistants' proxies. But it is the petitioner's contention—and our holding—that such proxies were themselves invalid and could not be issued under the National Labor Relations Act.

### III.

■■ We hold no more than that the general proxies issued by the Board members to those not legally responsible for the review of representation decisions were invalid under both the statutory requirements of the National Labor Relations Act and the fundamental concepts of administrative due process. The members may, of course, continue to rely on their assistants for case summaries, legal memoranda, and draft opinions. And it may be that the Board as a whole may utilize its rule-making authority to restrict further—in a general, principled manner—its review of representation cases. If the members find the individual consideration of review petitions too burdensome, they may of course, petition Congress for further relief.[14] So long as the Board's statuto-

12. Pursuant to a policy begun at some time more than two years ago, the Board, approximately two months after the completion of oral argument, issued a "press release" announcing the route awards it was granting in the Great Lakes-Southeast Service Case. The press release expressly stated that the announcement of the awards did not constitute decisions in the case but that decisions would be entered and issued later. We construe this language to mean that the announced awards did not constitute final determinations but were tentative only, and that there were to be no definitive awards until the issuance of the Board's formal opinion.

. . . [L]eaving aside the fact that these votes were merely tentative, we note that the votes in question were cast only after two days of discussion by the Board when all of its members were present, and that the votes later cast by the assistants were cast in compliance with instructions given by their superiors. Accordingly, we find no improper delegation. . . .
271 F.2d 752, 757-758.

13. We similarly find little, if any, support for the Board's position in our more recent decision in National Nutritional Foods, Inc. v. FDA, 491 F.2d 1141 (2d Cir. 1974). While it is true that the court there held that there could be no inquiry into the decisional basis of an administrator's ruling, the court was careful to note that the legally authorized official had in fact assumed responsibility for the decision by personally approving it. *Id.* at 1144, 1146. Here, by contrast, there was no such personal participation in the decision-making process.

This distinction between *National Nutritional Foods* and the instant case is further supported by the fact that two of the three judges who ordered the limited inquiry here into the members' participation, Judges Friendly and Anderson, took part in *National Nutritional Foods.*

14. In reaching this decision, we are not unmindful of the tremendous number of representation contests. In Fiscal Year 1972, 2228 cases reached the level of a final decision by the Regional Directors, with 176 receiving further review by the Board. Thirty-Seventh Annual Report of the National Labor Relations Board, 240 (1972).

There would appear to be two obvious possibilities open to the Board and Congress if the Board finds individual consideration too burdensome: First, § 9(c) of the Act could be amended to make the Regional Director's decision final; second, the quorum requirements of § 3(b) could be reduced to only one member for purposes of granting or denying review by a full three-member panel. In either case, it would be Congress—and not administrative expedience—that would be amending the nation's labor law.

ry basis and its own regulations provide for *Board* review of the Regional Director's decisions, however, it is the legally appointed and approved Board members, and not their staff assistants, who must make the final decisions on whether or not to grant review.[15]

We deny enforcement and remand for consideration of petitioner's request for Board review of the Regional Director's representation decision.

15. While the Regional Director's opinion may well be persuasive on petitioner's underlying claims, we cannot say that one who seeks full Board review in even such a case is clearly acting in bad faith, so as to constitute a refusal to bargain. *See*, Ernie Grissom Chevrolet, Inc., 168 N.L.R.B. 1052, 1055 (1967).