**T.S.C. MOTOR FREIGHT LINES, INC.,**
**and Herrin Transportation Co.,**
**Inc., Plaintiffs,**
**and**
**Central Freight Lines, Inc., and East Tex-**
**as Motor Freight Lines, Inc., Inter-**
**vening Plaintiffs,**

**v.**

**UNITED STATES of America, Interstate**
**Commerce Commission, Southern-Plaza**
**Express, Inc., and Strickland Transpor-**
**tation Co., Inc., Defendants.**

**Civ. A. No. 12620.**

United States District Court
S. D. Texas,
Houston Division.

Aug. 1, 1960.

Reagan Sayers, Jerry C. Prestridge, Lloyd Scurlock, Rawlings, Sayers, Scurlock & Eidson, Fort Worth, Tex., Leroy Hallman, Phinney & Hallman, Dallas, Tex., Jack Binion, Butler, Binion, Rice & Cook, Houston, Tex., for plaintiffs.

A. J. Watkins, Baker, Botts, Andrews & Shepherd, Houston, Tex., Phillip Robinson, Smith, Robinson & Starnes, Austin, Tex., for intervening plaintiffs.

Roger A. Clark, Washington, D. C., Robert A. Bicks, Acting Asst. Atty. Gen., William B. Butler, U. S. Atty., S. D., Texas, Houston, Tex., for defendant, United States.

Robert W. Ginnane, Gen. Counsel, James Y. Piper, Asst. Gen. Counsel, I. C. C., Washington, D. C., for defendant Interstate Commerce Commission.

Ewell H. Muse, Jr., Austin, Tex., W. N. Arnold, Jr., Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., for defendant Strickland Transp. Co.

Clarence D. Todd, Todd, Dillon & Singer, Washington, D. C., Dwight H. Austin, Liddell, Austin, Dawson & Huggins, Houston, Tex., Charles F. Riddle, Todd, Dillon & Singer, Washington, D. C., for defendant Southern-Plaza Express, Inc.

Before BROWN, Circuit Judge, and CONNALLY and INGRAHAM, District Judges.

JOHN R. BROWN, Circuit Judge.

This is an action by four motor carriers (TSC, Herrin, Central and East Texas)[1] to set aside certificates of public convenience and necessity, issued under § 207(a) of the ICC Act, 49 U.S.C.A. § 307(a), authorizing two additional motor carriers (Southern-Plaza and Strickland)[2] to operate between Houston and New Orleans.[3] We uphold the

---

1. Original plaintiffs, protestants before the Commission, both of which operate between Houston and New Orleans over the routes involved serving the points sought by the applicants, are:
   T.S.C. Motor Freight Lines, Inc. (TSC) and
   Herrin Transportation Co., Inc. (Herrin).
   The intervening plaintiffs are:
   Central Freight Lines, Inc. (Central) and
   East Texas Motor Freight Lines, Inc. (East Texas).
   Central operates between Orange, Texas and Houston over the route sought while East Texas, with somewhat limited authority, operates between Beaumont and Houston but not over the identical route here involved.

2. Defendant (applicant) carriers are:
   Southern-Plaza Express, Inc. (Southern Plaza) and
   Strickland Transportation Co., Inc. (Strickland)

3. The complaint filed by the interested motor carriers is for review by statutory three-judge court. 28 U.S.C.A. §§ 1336, 1398, 2284, 2321-2325; Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq.

awards, but with some modification, against a succession of attacks.

In 1954 Strickland applied for a certificate of public convenience and necessity for motor carriage of general commodities between Houston and New Orleans,[4] and in 1955 Southern-Plaza applied for a similar authority.[5] This followed on the heels of a recent major but unsuccessful attempt of these carriers to secure authority to operate between Houston and New Orleans.[6] Strickland's application sought Houston-New Orleans authority over two routes, the one via Beaumont, Texas, and Lafayette, Louisiana, called the "southern" route, and the other via Beaumont and Baton Rouge, Louisiana, called the "northern" route. The Southern-Plaza application sought authority over the southern route only.

Both of the applicants, Strickland and Southern-Plaza, are large trucking concerns with operations extending into several states. Both serve a number of major cities in Texas, such as, Dallas, Fort Worth, San Antonio, and Houston and operate between those points (among others) and such centers as St. Louis and Chicago. Strickland now holds authority to operate from Houston to Beaumont, over the route involved here, but not in the reverse direction.

After extensive hearings before Hearing Examiner Boss, the Examiner in a single report served in October 1957 recommended orders *denying* both applications. Exceptions and replies to the Examiner's report were filed, and the proceedings in the usual course were referred to Division 1 of the Commission "for action thereon." Thereafter, without any public report by Division 1 the matter was referred to the entire Commission. By a final report [7] issued October 14, 1958, the full Commission, while substantially adopting the Examiner's detailed statement of the facts, rejected the Examiner's recommendation and granted both applications. Strickland was awarded the so-called "northern" route [8] between Houston and New Orleans and Southern-Plaza, the "southern" route.[9]

Petitions for reconsideration and further hearing filed by the protesting carriers were denied in April 1959 "for the

4. Strickland Trans. Co., Extension, La. routes, No. MC–59680 (Sub. No. 117), filed June 21, 1954.

5. Southern-Plaza Express, Extension, La. routes, No. MC–10928 (Sub. No. 26), filed September 26, 1955.

6. Both Strickland and Southern-Plaza (then Southern Express, Inc.) had previously (by application filed in 1947) attempted to establish a need for additional motor transportation facilities between Houston and New Orleans. After extensive hearings, former Division 5 of the ICC found in favor of the applicants. But on reconsideration, Southern Exp., Inc., Common Carrier Application, 62 MCC 35 (1953), the full Commission reversed the Division 5 findings and denied the applications.

7. ICC Report, 77 MCC 655, decided October 14, 1958. Two Commissioners dissented and three Commissioners did not participate.

8. "We find in No. MC–59680 (Sub-No. 117) that the present and future public convenience and necessity require operation by applicant [Strickland], in interstate or foreign commerce, as a common carrier by motor vehicle of general commodities * * * between Houston, Tex., and New Orleans [via specified highways] * * * to Baton Rouge, La., thence * * * to New Orleans, and return over the same route, serving all intermediate points, but with service at Baton Rouge restricted to traffic moving to or from points west of the Louisiana-Texas State line * * *." ICC Report, note 7, supra, 77 MCC 655, 669.

9. "We find in No. MC–10928 (Sub-No. 26), that the present and future public convenience and necessity require operation by applicant [Southern-Plaza], in interstate or foreign commerce, as a common carrier by motor vehicle of general commodities * * * between Houston and New Orleans, over U.S. Highway 90, through Lafayette, La., serving all intermediate points, but with service at Lafayette and intermediate points between Lafayette and New Orleans restricted to traffic moving to or from points west of the Louisiana-Texas State line * * *." ICC Report, note 7, supra, 77 MCC 655, 669.

reason that the findings of the Commission are in accordance with the evidence and the applicable law." The Commission made no other basic findings or conclusions in connection with its order denying reconsideration.

The plaintiffs then filed this proceeding attacking the merits of the grants to Strickland and Southern-Plaza and also much of the procedure of the Commission in its handling of these applications. Specifically, the plaintiffs here complain of the procedure by which the Commission (1) issued its report without first having had Division 1 issue a report on the applications, (2) issued its report as the result of "constructive" sessions at which the members were not physically present, (3) allegedly had certain of its Attorney-Advisers, who were not Hearing Examiners, review the proceedings and make recommendations to the Commissioner, and (4) failed to make any additional findings on the petition for reconsideration and further hearing.

## I.

### Procedure in Handling the Applications

#### A. Action by Division 1

After the Hearing Examiner issued his report recommending *denial* of both applications, the matters (including ex-

ceptions to the report and replies) were submitted to Division 1 of the Commission "for action thereon." This is the normal procedure under the Commission's organizational rules [10] which delegate § 207 proceedings to Division 1. Normally the division renders a decision and issues a dispositive report and order subject to the right of the parties to petition for reconsideration by the entire Commission.[11] Departing from the usual course here, however, Division 1 did not make an official formal report. The proceedings were rather submitted directly to the entire Commission. Plaintiffs contend that the matters were not properly before the full Commission and that the Commission violated its organizational rules.

The Commission's organizational rules allow a division to "call upon the whole Commission for advice and counsel, or for consideration of any case or question by * * * additional Commissioners * * *." By the same token, "the Commission may recall and bring before it as such any case, matter or question" pending before any division.[12] The Commission never did enter an official order of recall. It seems to be generally assumed that the impetus for Commission action came from Division 1 who purported to certify the whole case to the full Commission.[13]

10. The Commission's organizational procedure and delegation of duties are basically governed by § 17 of the ICC Act. 49 U.S.C.A. § 17. Section 17(1) provides that "The Commission is authorized by its order to divide the members thereof into as many divisions * * * as it may deem necessary, which may be changed from time to time. * * *" Section 17(2) provides that "the Commission may by order direct that any of its work, business, or functions * * * be assigned or referred to any division * * *." Pursuant to this general authority, the Commission promulgated and published its Organization of Divisions and Assignment of Work of the Interstate Commerce Commission, 23 F.R. 1747.

11. ICC Organizational Rules, note 10, supra, §§ 4.1, 4.2(g).

12. ICC Organization Rules, note 10, supra, § 2.3, 23 F.R. 1747, 1748. "Each division with regard to any case or matter assigned to it * * * may call upon the whole Commission for advice and counsel, or for consideration of any case or question by an additional Commissioner or Commissioners assigned thereto; and the Commission may recall and bring before it as such any case, matter or question so allotted or assigned and may either dispose of such case, matter or question itself or refer the matter to the same or another division."

13. A memorandum dated July 23, 1958, made by the clearance clerk for Division 1, reports the decision of Division 1 to certify the proceedings to the entire Commission.

Plaintiffs have several objections to the purported certification by Division 1. First they claim that there is no authority for such a certification of the entire case. That can only be accomplished by an order of recall by the entire Commission. Second, even assuming that the Division could certify the whole case, the effort was ineffective here since the decision to certify was not properly recorded. Giving substance to their objections, plaintiffs argue that they had proceeded on the basis of Division action. Thus, briefs and other matters were prepared with Division 1, not the entire Commission, in mind. Had they known that it was to be the full Commission who would decide the case, the approach may have been quite different. Also, they contend that due to the abdication of Division 1, the protestants were deprived of a favorable [14] report by the Division or an opportunity, if the report were unfavorable,[15] to file a petition for reconsideration by the entire Commission together with additional briefs pointing out the errors of the Division report.

The certification of the cases to the Commission by Division 1 complies in all substantial respects with the Commission's organizational rules. This is so whether viewed as either a request by Division 1 for "advice and counsel" or as the assignment of additional Commissioners to consider the case. In either event, when the Commission accepted the certification and undertook to resolve the issues presented,. its action in effect amounted to a recall of that matter from the Division. The rule—whose purpose was to announce the orderly internal procedure of the Commission—provided its own exception: namely, consideration by the entire Commission whenever they deemed it expedient. Whether the initiating force for such a consideration by the entire Commission came from the Division or the Commission seems unimportant.

The vote to request consideration by the entire Commission was recorded in a memorandum prepared by the clearance clerk for Division 1, note 13, supra. There is no minute entry reflecting the action and the clerk's memorandum was not publicly recorded or served on the parties. Plaintiffs argue the action was a nullity in violation of § 17(3) of the ICC Act which provides that "[E]very vote and official act of the Commission, or any division * * * shall be entered of record, and such record shall be made public upon the request of any party interested." The purpose of this provision is to insure that parties have an opportunity to know of any action which may affect their rights. . It is especially necessary in cases in which an order of the division may become final within 20 days if no excep-

"July 23, 1958
"Memorandum to Director Coyle
"Division 1, Commrs. Murphy, Walrath & Goff, has today voted to certify the report circulated June 3, 1958 to the entire Commission for consideration and decision; Commr. Walrath voting to return the report for revision to grant both applications."

The "report circulated June 3, 1958" referred to in the memorandum indicates that Division 1 apparently had drafted a report. ..

14. The "report circulated June 3, 1958," may have recommended denial of the applications. The clerk's memorandum, note. 13, supra, recites that Commissioner Walrath voted "to return. the report for *revision* to grant *both* applications." (Emphasis supplied.) Therefore, the tentative report may have been either a denial of both applications or a grant of one application and a denial of the other.

15. Applicants have some ground for thinking that the report may have recommended granting at least one of the applications. The clearance clerk's memorandum, note 13, supra, indicates that Commissioner Walrath favored granting both applications. Commissioner Goff finally dissented from the Commission's granting of both applications. Commissioner Murphy (who replaced Commissioner Hutchinson) eventually voted with .the entire Commission to grant both ap-.plications. But apparently Commissioner Murphy and Commissioner Goff felt that the cases should go before the whole Commission.

tions are filed by the parties.[16] It is difficult to see how the plaintiffs could have been prejudiced by the failure to record the action of Division 1 since it resulted in a consideration by the entire Commission of the proceedings. What the whole Commission has delegated, it obviously could recall and consider as a body.[17] Moreover, the protestants could not have challenged the right of the Commission to take the whole case. They lost no right to complain nor to complain by a certain time. In the absence of prejudice, the action of the Commission must stand. See § 10(e), 5 U.S. C.A. § 1009(e); ABC Freight Forwarding Corp. v. United States, D.C.S.D.N.Y. 1959, 169 F.Supp. 403, 406, citing Market Street Railway Co. v. Railroad Commission, 1945, 324 U.S. 548, 561–562, 65 S.Ct. 770, 89 L.Ed. 1171.

Secondly, it is difficult to see how the plaintiffs could have been injured by the failure of Division 1 to issue a report. The referral to Division 1, in the first instance, was merely a permissive delegation of the Commission's responsibility to determine the case. The contention that if the circulated but undisclosed report was unfavorable, the protestants were deprived of an opportunity to file a petition for reconsideration by the entire Commission overlooks the fact that this is exactly what occurred—the matter was considered by the entire Commission. Plaintiffs still had the right to petition for reconsideration after the report of the entire Commission. And this, of course, they did. The argument that the briefs may have been written differently if the plaintiffs had known that the persons deciding the case were other than those expected needs little comment. The Commission is, of course, an institutional agency and the appeal must be to the institution, not to the personal predilection of the individual members. The make-up of the divisions, as the make-up of the Commission, may change. In any event, new arguments or appeals could be made in amended or supplemental briefs.

### B. "Constructive" Sessions— Notation Voting

■ Plaintiffs argue that the final report and orders of October 14, 1958, note 7, supra, were invalid because adopted by the Commission through voting by notation [18] rather than at a conference at which the Commission members were physically present and assembled together. Plaintiffs attack this procedure as calling for action of individual members of the Commission rather than the official action of the Commission as

---

16. See, e. g., 49 U.S.C.A. § 17(5).

17. See note 10, supra.

18. The vote-by-notation procedure is set up in the minutes of the Commission of October 2, 1953:

"3. Constructive Sessions: Action by Notation.

"(A) At other than regular or special conferences official action may be taken by the Commission * * * [or] any division * * * in constructive session through voting by notation. For this purpose (1) a copy of the report, order, or other document under consideration may be used as a manuscript on which each Commissioner * * * will indicate his vote, or (2) each Commissioner * * * may cast his vote by separate memorandum. In each instance, the participating Commissioners * * * may informally confer * * * or exchange their views in writing. * * * [T]he date of decision shall be the date upon which the last individual vote is cast. If, before the votes of all others participating in the voting have been cast, any Commissioner * * * shall request, in writing, conference consideration, or if in the judgment of the Commissioner * * * through whose office the votes are to be cleared undue delay in the voting occurs, the subject-matter will be transferred to an appropriate conference agenda.

"(B) The vote by memorandum of each Commissioner * * * shall be sent to the Commissioner * * * through whose office the matter is to be cleared. Copies of such vote need not be circulated to the other Commissioners * * * unless it explains the reason for the vote. A copy of the clearance memorandum * * * shall be sent to each Commissioner * * *."

a body. Moreover, such a procedure is invalid because not published in the Federal Register.

Although there is little federal authority,[19] the state courts universally require that official action of state commissioners,[20] town counsels,[21] county boards,[22] school boards,[23] church trustees,[24] and corporation boards of directors [25] must be conducted in formal meetings attended by the necessary quorum. Here each side professes to see in § 17 (3) of the ICC Act language which sustains its position. Plaintiffs cite the statement that "a majority of the Commission [or] of a division * * * shall constitute a *quorum* for the transaction of business" as clearly indicating that a meeting at which the members are physically present is indispensable. Moreover, the references throughout the Act to "commission" or "board" contemplate joint action by members physically present with an opportunity to deliberate, exchange views, persuade or be persuaded by the force of argument and ultimately decide and pursue a jointly reached course of action. But on the other hand, § 17(3) provides that "the Commission shall conduct its proceedings under any provision of law in such manner as will best conduce to the proper dispatch of business to the ends of justice * * *."

We think that notation voting may be selected by the Commission as a proper

19. The Federal Communications Commission justified its notation voting procedure in the disposition of *interlocutory* matters: "Throughout the existence of the Commission, it has been the consistent practice with respect to interlocutory matters requiring disposition before the next scheduled meeting of the Commission, to take action by circulation. This practice has been followed in view of the provisions of section 4(j) of the Communications Act of 1934, as amended, which provides that 'the Commission may conduct its proceeding in such manner as will best conduce to the proper dispatch of business and the ends of justice.' * * * *" In re Applications of Jackson Broadcasting Co., 13 Fed. Comm. 72, 3A Ad.L. (Pike and Fischer) 48C.15–1 (F.C.C.1948).

Congress has had notice from time to time of the notation voting procedure of various agencies. Notation voting within the divisions of the Interstate Commerce Commission is described in the monograph of the Attorney General's Committee on Administrative Procedure, Part 11, page 36 (1941), Sen.Doc. No. 10, 77th Cong. 1st Sess. See also The Report on Practices and Procedures of Governmental Control by the Board of Investigation and Research, House Doc. No. 678, 78th Cong. 2nd Sess. 1944, page 194; Potter v. United States, 1883, 107 U.S. 126, 1 S.Ct. 524, 27 L.Ed. 330; Smith v. United States, 1898, 170 U.S. 372, 18 S.Ct. 626, 42 L.Ed. 1074; Lytle v. State of Arkansas, 1850, 9 How. 314, 50 U.S. 314, 13 L.Ed. 153.

20. E.g., Webster v. Texas & Pacific Motor Transport Co., 1942, 140 Tex. 131, 166 S.W.2d 75 (Texas Railroad Commission); State ex rel. Lemke v. Union Light, Heat & Power Co., 1921, 47 N.D. 402, 182 N.W. 539 (State Railroad Commission); Schwanbeck v. People, 1890, 15 Colo. 64, 24 P. 575 (State Board); 42 Am.Jur. Public Administrative Law § 74 (1942). But see, Southern California Jockey Club v. California Horse Racing Board, 1950, 36 Cal.2d 167, 223 P.2d 1; Erkman v. Civil Service Comm. of Provo City, 1948, 114 Utah 228, 198 P.2d 238.

21. Murphy v. City of Albina, 1892, 22 Or. 106, 29 P. 353; Pennsylvania R. Co. v. Montgomery County Pass. Ry. Co., 1895, 167 Pa. 62, 31 A. 468, 27 L.R.A. 766; City of Floydada v. Gilliam, Tex.Civ.App. 1937, 111 S.W.2d 761; King v. Guerra, Tex.Civ.App.1927, 1 S.W.2d 373.

22. Paola & Fall River Ry. Co. v. Commissioners of Anderson County, 1876, 16 Kan. 302.

23. School Dist. No. 39, Pottawatomie County v. Shelton, 1910, 26 Okl. 229, 109 p. 67; Honaker v. Board of Education, 1896, 42 W.Va. 170, 24 S.E. 544, 32 L.R.A. 413; McNolty v. Board of School Directors, 1899, 102 Wis. 261, 78 N.W. 439; but see, School District No. 25 of Jefferson County v. Stone, 1900, 14 Colo. App. 211, 59 P. 885, 887.

24. Thompson v. West, 1900, 59 Neb. 677, 82 N.W. 13, 49 L.R.A. 337; Nason v. Directors of Poor for Erie County, 1889, 126 Pa. 445, 17 A. 616.

25. 13 Am.Jur., Corporations § 948.

manner of dispatching its business. *When* a meeting of the Commissioners assembled together is held, of course, as the Act specified, a majority shall constitute a quorum. But in view of the broad grant to the Commission of authority to control its proceedings, it may select this type of voting procedure as an *aid in dealing* with its tremendous workload.

The statute does not specifically provide that administrative action be taken *concurrently by the deciding members* in a formal meeting and we decline to impose such requirement.

■ Nor is the procedure of notation voting rendered a nullity because not published in the Federal Register. The minute authorizing it is recorded in the official record of the Commission. although never published in the Federal Register. We think that the procedure falls within one of the specific exemptions from the requirement of publication. The statute exempts "any matter relating solely to the internal management of an agency." § 3(a), Adm.Proc. Act, 5 U.S.C.A. § 1002. The last sentence of § 3(a) gives meaning to the exemption. "No person shall in any manner be required to resort to organization or procedure not so published." 5 U.S. C.A. § 1002(a). Obviously the procedure is solely a matter of internal procedure within the Commission. It does not purport to inform parties of the procedure which is to be taken for the presentation of matters to the Commission. It is not designed for the guidance of the public because it in no way affects any steps which interested parties must take or not take in order to obtain, or review, action by the Commission. As the court in Foreman & Clark, Inc. v. National Labor Relations Board, 9 Cir., 1954, 215 F.2d 396, at page 410, certiorari denied 348 U.S. 887, 75 S.Ct. 207, 99 L.Ed. 697, stated: "the clear purpose of Section 3 (a) * * * is to provide a *shield* for a petitioner before * * * [an] agen-

cy, to protect him from being penalized for failing to resort to unpublished methods of procedure. It is not a *sword* by which a petitioner can strike down the agency's order on the ground that the agency *has not authorized itself* to issue that type of order, by publishing a statement in the Federal Register!" Thus, the procedure of notation voting, otherwise valid, is not rendered invalid because it was not published in the Federal Register.[26]

### C. Lack of Findings in Order Denying Petition for Reconsideration.

■ The Commission denied the petition for reconsideration in April 1959 " * * * for the reason that the findings of the Commission are in accordance with the evidence and the applicable law." Plaintiffs contend that with this conclusion and nothing more there is a lack of the basic or essential findings required to support the Commission's order. Amarillo-Borger Express v. United States, D.C.N.D.Tex.1956, 138 F.Supp. 411 (3-judge), appeal dismissed as moot 352 U.S. 1028, 77 S.Ct. 594, 1 L.Ed.2d 598; Dixie Carriers, Inc., v. United States, D.C.S.D.Tex.1956, 143 F.Supp. 844 (3-judge), appeal dismissed as moot 355 U.S. 179, 78 S.Ct. 258, 259, 2 L.Ed.2d 186. The Administrative Procedure Act, 5 U.S.C.A. § 1007(b) requires a statement of findings and conclusions "as well as the reasons or basis therefor." The Amarillo-Borger and Dixie Carriers cases involve orders entered for "good cause appearing" which vacated and overruled existing Commission orders suspending proposed rates [138 F.Supp. 414.] There were no basic findings and conclusions or reasons therefor to support the order overruling the prior controlling orders except the cryptic phrase "good cause appearing." The court held: "The Commission may, as any other body, have the right to change its mind, but its action must demonstrate the 'rea-

---

26. Cf. Columbia Research Corp. v. Schaffer, 2 Cir., 1958, 256 F.2d 677; G. J. Howard Co. v. Cassidy, D.C.E.D.N.Y. 1958, 162 F.Supp. 568, 574; Pinkus v. Reilly, D.C.D.N.J.1957, 157 F.Supp. 548.

sons or basis therefor.'" Amarillo-Borger Express v. United States, supra, 138 F.Supp. 411, at page 420. The Administrative Procedure Act does not require that detailed findings with supporting reasons previously made and adhered to by the Commission be reiterated after each attack. The statement by the Commission that the "findings of the Commission [are] in accordance with the evidence and the applicable law" is obviously a statement that the Commission is standing behind the original detailed and articulate findings and conclusions. The law requires no more.

### D. Use of Attorney-Advisers

Plaintiffs contend that the Commissioners used attorney advisers, who were not qualified as APA hearing examiners, to review the record of the proceedings conducted by the Hearing Examiner (together with the exceptions and replies to the Examiner's report) and make recommendations—which were never served upon the parties—to aid the Commissioners in reaching their decisions. This was, they urge, especially harmful in this case since the final report rejected the recommendations of the Hearing Examiner. The Commission, although contending that the issues were not raised before the Commission and should not properly be considered by this court, United States v. L. A. Tucker Truck Lines, 1952, 344 U.S. 33, 36, 73 S.Ct. 67, 97 L.Ed. 54; Monumental Motor Tours v. United States, D.C.D.Md.1953, 110 F.Supp. 929, 932, does not deny that its practice is to have staff attorney subordinates review the record and make recommendations. These attorney reviewers do not, however, participate in either the investigating or prosecuting functions of the Commission, nor do they take part in the proceedings before the Hearing Examiner.

There are three stages of review by the attorney reviewer. First, taking the Hearing Examiner's report, exceptions and replies, the reviewer prepares a draft of a final report. This report is a recommendation by the adviser who is expected to arrive at his recommendation through his independent study of the record. This report is then turned over to another reviewer who, unfamiliar with the case, goes over the draft of the initial staff reviewer. This re-reviewer may make changes, but if he disagrees with the draft of the initial reviewer then the draft of the initial reviewer must go to the Commission along with the comments of the re-reviewer. The final step, is by the Review Committee composed of three men of the greatest experience on the staff who take a "quick look" at the report before it goes to the division or Commission. The draft and recommendation is then sent to the Commission.[27]

The crux of the plaintiff's argument is that the Administrative Procedure Act applies to the "intermediate review" stage to the same extent that it applies to proceedings before the Hearing Examiner. Wong Yang Sung v. McGrath, 1950, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616; Riss & Co. v. United States, D.C.W.D.Mo.1950, 96 F.Supp. 452, reversed 1951, 341 U.S. 907, 71 S.Ct. 620, 95 L.Ed. 1345. Specifically, plaintiffs argue, review of evidence in making of recommendations can only be done by Hearing Examiners qualified under § 11 of the Administrative Procedure Act, and these recommendations must be served upon the parties who must be given an opportunity to file exceptions to them. The Commission vigorously defends the use of the attorney-reviewers as necessary and essential for effective staff assistance in the internal decisional process

27. The Hoover Commission commented upon such a review. Legal Services and Procedure, March 1955, by the Commission on Organization of the Executive Branch of the Government, at page 202: "In some agencies like the Interstate Commerce Commission, moreover, the record made by the hearing examiner is often subject to further review by other officers who have not heard the evidence, before the record is submitted to the agency for final decision. This practice tends to weaken the administrative process by diminishing the responsibility and status of the officer who conducts the hearing."

of the Commission. Relying mainly on cases [28] decided before the enactment of the Administrative Procedure Act, the Commission contends that the Administrative Procedure Act was not intended to cut off such effective staff assistance.

■ Plaintiff's argument that the staff review violates the Administrative Procedure Act is based on § 7 [29] relating to the qualifications of the individual who acts and § 8(b) [30] relating to the decisions rendered. But § 7 provides that an examiner qualified under the Act "shall *preside at the taking of evidence.*" Obviously, the purpose was to govern the qualifications of the individual conducting the hearing, ruling on the admissibility of evidence, and charged with the responsibility of making the record and, where done, the initial decision. It would be difficult to read the language of § 7 to include staff assistants who review and make recommendations to aid the Commissions in their study of the record of proceedings conducted by the Examiner.[31]

28. Morgan v. United States, 1936, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288; Morgan v. United States, 1938, 304 U.S. 1, 18, 58 S.Ct. 773, 999, 82 L.Ed. 1129; United States v. Morgan, 1941, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429; Norris & Hirshberg v. S. E. C., 1947, 82 U.S.App.D.C. 32, 163 F.2d 689, 693, certiorari denied 333 U.S. 867, 68 S.Ct. 788, 92 L.Ed. 1145.

29. "In hearings * * * conducted pursuant to this section—
"(a) There shall preside at the taking of evidence (1) the agency, (2) one or more members of the body which comprises the agency, or (3) one or more examiners appointed as provided * * *." 5 U.S.C.A. § 1006(a).

30. "In cases in which a hearing is required to be conducted in conformity with section 1006 * * *
  *       *       *       *       *
"(b) Prior to each recommended, initial, or tentative decision, or decision upon agency review of the decision of subordinate officers, the parties shall be afforded a reasonable opportunity to submit for the consideration of the officers participating in such decisions (1) proposed findings and conclusions, or (2) exceptions to the decisions or recommended decisions of subordinate officers or to tentative agency decisions, and (3) supporting reasons for such exceptions or proposed findings or conclusions. The record shall show the ruling upon each such finding, conclusion, or exception presented. *All decisions (including initial, recommended, or tentative decisions) shall become a part of the record and include a statement of (1) findings and conclusions, as well as the reasons or basis therefor, upon all of the material issues of fact, law, or discretion presented on the record; and (2) the appropriate rule, order, sanction, release, or denial thereof.*" 5 U.S.C.A. § 1007(b).

31. The use of staff assistants in making recommendations on the record was sanctioned before the passage of the Administrative Procedure Act. See note 28, supra. When Congress undertook to regulate internal agency staff collaboration it did so specifically. In § 5(c) of the Act, Congress specifically prohibited consultation between staff members engaged in investigative and prosecuting functions of an agency with those participating in the adjudicatory function of an agency:
"No officer, employee, or agent engaged in the performance of investigative or prosecuting functions for any agency in any case shall, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review * * * except as witness or counsel in public proceedings." 5 U.S. C.A. § 1004(c).
The Attorney General's Manual on the Administrative Procedure Act, 1947, a document of importance in the development of the Administrative Procedure Act, pointed out the need for staff assistance, but also the essential need to separate functions to insure fair and impartial hearings: "The expertise of an administrative agency is not limited to the heads of the agency; it includes also the staff of specialists through whom and with whose assistance most of the agency's functions are carried on. The issues in adjudicatory cases, while frequently less complex and with narrower policy implications than are often involved in rule making, present in many cases difficult questions of law and policy. * * * In determining such issues, agency heads have consulted with their principal advisers and specialists. Indeed, it is clearly in the public interest that they continue to do so. Section 5 (c) does not purport to isolate the agency heads from their staffs. Rather, in the interest of fair procedure, it mere-

The applicable part of § 8 provides that before a "decision upon agency review of the *decision* of subordinate officers the parties shall be afforded a reasonable opportunity to submit * * (1) proposed findings and conclusions, or (2) exceptions to the decisions or recommended decisions of subordinate officers * * * ." Further, "[a]ll decisions (including initial, recommended, or tentative decisions) shall become part of the record * * * ." The contention of the plaintiffs apparently is that any staff recommendation after review of the record of the Hearing Examiner, exceptions and replies, is either a recommended or a tentative decision within the meaning of the section. Reference to other sections, however, indicates that what was contemplated by a "recommended decision" was one made by a Hearing Examiner when the agency itself makes the initial decision without having presided at the taking of evidence. This would also include an initial decision made by a Division under the delegation procedure and in which no hearings are held before an Examiner. This would also include those in which the Examiner's proposed order may become final under § 8(a). Section 8(a) provides that decisions or recommended decisions of the Examiner shall become final in the absence of appeal to the agency by the parties or reconsideration on motion of the agency itself.[32] Similarly, § 17(5) of the Interstate Commerce Act provides that findings or orders of an individual commissioner or board shall, in the absence of appeal, become the order of the full Commission.[33] In adjudicatory cases a "tentative decision" is substantially equivalent to a "recommended decision." More often it is regarded as one issued by an agency in rule-making or initial licensing procedure in which no recommended or initial decision by the Hearing Examiner is involved. Or, as the term implies, it may be one in which the agency or the hearing officer couches the order in terms which will be followed unless the parties show good reason to the contrary.

The distinction between the function of a Hearing Examiner and the Commission (or a division of it) must be kept carefully in mind. Much is committed to the Examiner and the aim of the APA was to give him a position of judicial independence and disinterestedness. His findings and conclusions, or recommended action, will have great significance. But the final decision is that of the Commission. The Commission is not, as would be the case of a court reviewing a trial judge's non-jury decision or the action of an administrative agency under clearly erroneous or substantial evidence concepts, bound by the Examiner's decision. It is, of course, a relevant and important part of the ad-

---

ly excludes from any such participation in the decision of a case those employees of the agency who have had such previous participation in an adversary capacity in that or a factually related case that they may be 'disabled from bringing to its decision that dispassionate judgment which Anglo-American tradition demands of officials who decide questions.' " Attorney General's Manual at 56–57 (1947).

It is significant that Congress in two statutes subsequent to the Administrative Procedure Act has specifically provided for a separate opinion and review section for the Federal Communications Commission (see 47 U.S.C.A. §§ 155(c), 409) and for individual review by a legal assistant for each member of the National Labor Relations Board (see 29 U.S.C.A. § 154(a)).

**32.** 5 U.S.C.A. § 1007(a): " * * * Whenever such officers make the initial decision and in the absence of either an appeal to the agency or review upon motion of the agency within time provided by rule, such decision shall without further proceedings then become the decision of the agency."

**33.** 49 U.S.C.A. § 17(5). Staff recommendations on the other hand have no such finality until they have actually been adopted by the Commission or by division. To read § 8(b) as requiring that all staff memoranda be subjected to exceptions and replies and be placed in the record would effectively destroy their usefulness in aiding the individual commissioners in the decisional process.

ministrative record. Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 492–497, 71 S.Ct. 456, 95 L.Ed. 456, 469–472. But the final decision must be that of the Commission. Consequently it is not a mere matter of the Commission's reviewing the Examiner's proposed report to see whether it is supported by sufficient evidence. That means that in the performance of this duty of ultimate responsibility the Commission and its members may properly call on staff assistance in satisfying the almost insuperable demands on this personal institutional accountability.

Congress is aware of the tremendous volume of business which is the ultimate responsibility of the Commission, and hence the Commissioners. The APA was intended to reach the vice of infection of the adjudicatory body by the partisan views of those having investigatory and prosecuting duties. Congress did not mean to leave this small group of Commissioners bereft of staff assistance in the assimilation of the great flood of formal cases requiring decision. The decision is still that of the Commissioners. Each bears full legal and personal accountability for that which bears his name or concurrence. The system requires a full public report of reasons and conclusions. With these safeguards Congress deemed the question of the identity and actions of staff assistants to be matters beyond question by the parties.

## II.

### Substantiality of the Evidence

■ Plaintiffs vigorously attack the granting of both applications on the grounds that they are not bottomed and supported by substantial evidence viewing the record as a whole. Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. Giving color to this argument is the fact that the Commission, while adopting the many factual statements of the Hearing Examiner, rejected the recommendations of the Examiner and reached a directly contrary result. In assaying the substantiality of the evidence supporting the Commission's action, ours is the limited task of determining whether the conclusion of the Commission "finds support in the record as a whole, * * * 'even though the court would justifiably have made a different choice had the matter been before it de novo.'" N. L. R. B. v. Fant Milling Co., 1959, 360 U.S. 301, 309, 79 S.Ct. 1179, 1184, 3 L.Ed.2d 1243; United States v. Pierce Auto Freight Lines, 1946, 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821; § 10(e), Administrative Procedure Act, 5 U.S.C.A. § 1009(e). If the Commission has made adequate findings which are in turn supported by substantial evidence, viewed in the light that the record in its entirety furnishes, a reviewing court may not set the order aside even though the court may disagree with the ultimate findings of the Commission. Interstate Commerce Commission v. Union Pacific R. Co., 1912, 222 U.S. 541, 547, 32 S.Ct. 108, 56 L.Ed. 308; Rochester Telephone Corp. v. United States, 1939, 307 U.S. 125, 139–140, 59 S.Ct. 754, 83 L.Ed. 1147; Universal Camera Corp. v. N. L. R. B., supra.

■ It is the duty of the Commission to determine the question of public convenience and necessity—a judgment as to the public interest—in an application for additional transportation facilities under § 207(a).[34] Interstate Commerce Commission v. Parker, 1945, 326 U.S. 60, 65 S.Ct. 1490, 89 L.Ed. 2051.

■ Here the Commission made its findings of public convenience and neces-

---

34. § 207(a) of the Interstate Commerce Act, 49 U.S.C.A. § 307(a), provides: " * * * a certificate [of public convenience and necessity] shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, if it is found that the applicant is fit, will-

ing, and able properly to perform the service proposed * * * and that the proposed service * * * is or *will be* required by the present or *future* public convenience and necessity; otherwise such application shall be denied * *." (Emphasis supplied.)

sity requiring the granting of the two applications based largely on its judgment that the existing service was unsatisfactory and that the proposed service was feasible and appropriate. The Commission's basic conclusion—which the plaintiffs here vigorously contest— is that "the existing service of Herrin and TSC between Houston and New Orleans is not reasonably adequate to meet the present and future requirements of the public for expeditious motor service * * *." ICC Report, supra, 77 MCC at 677. "[Herrin and TSC] have demonstrated * * * that they cannot be depended upon to provide the type of service of which they are capable, except when faced with an imminent threat of additional competition." ICC Report, supra, 77 MCC at 666. These conclusions were based largely on complaints of shippers which complaints the Commission stated "characterize the over-all service as undependable." Such complaints fall into two general categories, (1) delay in picking up shipments and delay in making local deliveries and (2) excessive and irregular transit times.

It is inappropriate and unnecessary for us to recite the evidence of the individual witnesses. Over 100 persons support Strickland's application and 40 shippers or receivers support the application of Southern-Plaza. It is sufficient to give a general brief description of the testimony.

Witnesses recited their experience in the years 1954, 1955 and 1956 with respect to unsatisfactory pickup service by the existing carriers. Some of the shippers testified that because of delayed pickup service and their need for prompt shipment, they were forced to deliver shipments to the carrier's docks. Others testifying to the unsatisfactory service they had received commented upon the noticeable improvement after the filing of the applications by Strickland and Southern-Plaza. The complaints which the Commission was entitled to credit were largely that the particular carrier failed to pick up shipments on the same day it was requested to do so. In the same vein, some witnesses testified that they found it necessary to pick up their incoming shipments at the carrier's dock if they wanted them the same day the shipment arrived.

The objection which the Commission characterized as the "most serious complaint against existing service" was that relating to excessive and irregular transit time. Although the Commission considered some of the delay excusable because of week-end shutdowns, the Commission stated that from the past experience of many of the shippers it was clear that they had been subjected to a substantial amount of mediocre and poor service.[35] Herrin and TSC countered that they hold out and advertised 2-day service as well as overnight service between Houston and New Orleans. Further, as shown in the Examiner's report, in excess of 90% of the shipments handled by Herrin during August 1955 (immediately prior to the hearings) were accorded 2-day or better service. But the carriers hold themselves out to furnish expedited service also and too many shipments, the Commission found, were given inadequate or slow service.

Another facet of the "transit time" problem is a complaint by some of the supporting shippers, from San Antonio, of delay incidental to the interchange of freight at Houston. Specific instances of such delay are recited in the evidence.

The evidence adequately supports the Commission's ultimate finding. It is the conventional type of evidence usually submitted to the Commission in proceedings of this kind calling for the evaluation of many variable factors and the

---

35. "Recapitulating certain figures tabulated by the examiner * * * it is noted that of 692 shipments handled by Herrin and TSC for the supporting shippers from Houston to Baton Rouge, only 379, or about 55 percent, were afforded 1-day service, 207 were afforded 2-day service, and 106 or about 15 percent required 3 days or more for delivery. Of 616 shipments handled by Herrin and TSC for the supporting shippers from Houston to New Orleans, 166 or about 27 percent were afforded 1-day service, 391 were afforded 2-day service, and 59 required 3 or more days." ICC Report, 77 MCC 655, 664.

exercise of sound judgment to reach an equitable and fair decision. The evidence adduced supports the statements of underlying reasons made by the Commission. And the evidence showing a noticeable increase in satisfactory service shortly prior to the hearings on these applications further supports the basic conclusion of the Commission on the need for additional service. If the prospect of additional competition brings about such beneficent results, surely the Commission in the exercise of its informed judgment could find that the additional carriers would give a healthy climate of controllable competition without being destructive to the position of the existing carriers.

The applicants' proposed service contemplates service between all points which they now serve, on the one hand, and on the other, New Orleans and points between Houston and New Orleans. The applicants both propose regularly scheduled overnight service between Houston and New Orleans. Strickland also proposes a number of schedules between Houston and the principal intermediate points, and plans to have terminals at those intermediate points. It plans to have service between those small intermediate points provided generally by so-called peddle runs. The Commission concluded "the schedule set up by applicant governing their proposed operations between Houston and New Orleans are * * * entirely reasonable; and we have no basis to doubt that either appli-

cant can, or would, maintain the service proposed if the instant applications are granted."

The Commission concluded that the amount of additional service resulting from the granting of the applications would not endanger the existing services of Herrin and TSC. This was based upon its informed judgment that the amount of traffic available, based in part on figures submitted by Herrin and TSC,[36] is or will be sufficient to support the additional operation of both applicants between Houston and New Orleans.[37]

The Commission granted Strickland the "northern" route and Southern-Plaza, the "southern" route. Thus Baton Rouge will be served by Strickland alone and Lafayette will be served by Southern-Plaza alone. There will be no added competition in the local service between New Orleans and Baton Rouge and between New Orleans and Lafayette and points intermediate thereto since the Commission imposed restrictions to protect such existing local services.[38]

### Complaint of Intervenors Central and East Texas

These two intervenors operate between Beaumont-Orange and Houston although East Texas has a somewhat restricted authority. They complain that the final order authorizes two new services, "(1) between Orange, Beaumont and Houston and (2) between Orange, Beaumont and other points on U. S. Highway 90 inter-

36. Figures submitted by Herrin and TSC indicated a daily average tonnage of 830,000 pounds handled between Houston and New Orleans; 110,000 pounds between Beaumont and New Orleans, 117,000 pounds between Houston and Lake Charles, 97,000 pounds between Houston and Baton Rouge, and 141,000 pounds between Houston and Lafayette.

37. This is the point on which one commissioner dissented. 77 MCC 655, 670–71: "Considering * * * the fact that no need has been shown for greater quantum, as distinguished from quality, of service, I am not convinced that the record justifies the granting of the two applications. To double the number of direct single-line carriers between the

termini here involved would dilute the available traffic possibly to such a considerable extent that it might eventually result in deteriorated service as well as produce unsound economic conditions, contrary to the objectives of the national transportation policy. I believe, therefore, that if any authority is to be granted, it should be to one applicant only * * *."

38. Service at Baton Rouge was restricted to traffic moving to or from points west of the Louisiana-Texas state line. Service at Lafayette and intermediate points between Lafayette and New Orleans was restricted to traffic moving to or from points west of the Louisiana-Texas state line.

mediate to Orange and Houston, on the one hand, and, on the other, San Antonio, Fort Worth, Dallas, St. Louis, Chicago, and other points now authorized to be served direct by Strickland and Southern-Plaza." They further assert that there is no evidence that public convenience and necessity requires such services, nor are there requisite findings in the report to support those conclusions. They point to the "manifest inconsistency within the report as between involved local services in Louisiana and local services in Texas, and as between proposed off-route services and proposed through services from Beaumont and Orange to the west and north, and vice versa."

■ There does not seem to be any serious dispute between the intervenors and the applicants concerning what the testimony was before the Hearing Examiner with respect to truck service to and from Orange and Beaumont. The testimony of the witnesses to which we have been referred deals in every case, except one, R. W. Smith and Company,[39] with shipments between Orange and Beaumont on the one hand, and points in Louisiana on the other. It may be fairly said that there was no showing of inadequate service from Orange and Beaumont, on the one hand, and Houston on the other. Therefore, the question is resolved into a question of law. That is, must there be adequate evidence of public convenience and necessity for additional service between Beaumont-Orange and Houston to support the specific service award here challenged?

Strickland already has authority to carry from Houston to Beaumont, but not in the reverse direction. Southern-Plaza had no authority to carry between Houston and Beaumont or Orange or reverse. Strickland and Southern-Plaza

urged that the question is merely whether "tacking" should be allowed. The "tacking" argument would apply to Strickland's Houston to Beaumont service. And so far as points west or north of Houston, such as San Antonio, Ft. Worth, Dallas, St. Louis, Chicago, which Strickland and Southern-Plaza were previously authorized to serve, the new authority is properly regarded as "tacking." [40] The Commission's order is adequate as to evidence and findings to sustain the order with respect to such transportation. But it is incorrect to attempt to justify new service between Beaumont-Orange and Houston on the principle of "tacking." Whether a grant of authority between Houston and New Orleans should include authority for local service between Beaumont-Orange and Houston or shipments destined for or originating from such points is obviously a question on which evidence on the need for that particular service must be adduced.

This means that service between Beaumont-Orange and Houston (and intermediate points) was required to be supported by evidence of public convenience and necessity. This extends to shipments originating in Houston or beyond destined to move through Houston to Beaumont-Orange or any points intermediary to Houston and Beaumont-Orange as well as any return shipments going in the reverse direction.

Intervenors, Central and East Texas, rely on Hudson Transit Lines v. United States, D.C.S.D.N.Y.1948, 82 F.Supp. 153, affirmed 338 U.S. 802, 70 S.Ct. 59, 94 L.Ed. 485, and L. A. Tucker Truck Lines v. United States, D.C.E.D.Mo.1953, 115 F.Supp. 647. Both of these cases involved the setting aside of a certificate of public convenience and necessity which authorized service between intermediate points within the scope of broad-

39. Mr. Posey of R. W. Smith and Company testified that he had shipments from Houston to Beaumont, New Orleans, and points further east. On cross-examination Mr. Posey said that he had never had any great difficulty with Herrin to Beaumont, and that he had never used TSC to Beaumont.

40. E.g., M. I. O'Boyle & Son, Inc. v. Interstate Commerce Comm., 1953, 92 U.S. App.D.C. 383, 206 F.2d 473, 475; Century-Matthews Motor Freight v. Thrun, 8 Cir., 1949, 173 F.2d 454, 456.

er rights because of the failure to show the necessity for that particular localized service. So much of the certificate authorizing the service between a particular intermediate point that was not supported by substantial evidence of necessity for the service was set aside.[41]

In view of the persuasiveness of these two cases, and the obvious inapplicability of the "tacking" cases cited by applicants, so much of the certificate granting authority for new service between Beaumont-Orange and Houston must be set aside. This will not affect the existing authority of Strickland to operate from Houston to Beaumont, but not in the reverse direction.[42]

## Miscellaneous Objections

There is no merit to the contention that the Commission failed to consider the adequacy of rail service or the impact of these grants upon such carriers. "Many of the supporting shippers are now utilizing rail service to some extent,

but all prefer motor service for expeditious handling of their smaller shipments. They complain generally of the service received from existing carriers, both motor and rail." ICC report, supra, 77 MCC 655, 660.

Plaintiffs' contention that the Commission failed to make findings in terms of the national transportation policy [43] has no merit.

The report of the Commission is a detailed, careful, and articulate exposition of its judgment as to the adequacy of the existing services, the present and probable future need for additional services, the desirability of such additional services as a result of a controlled competition, and its judgment as to the effect the additional service will have on existing carriers. Unless, as in cases like Pacific Inland Tariff Bureau v. United States, D.C.D.Or.1955, 129 F.Supp. 472 (3 judge), and Schaffer Transportation Co. v. United States, 1957, 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117, where special

41. In Hudson Transit Lines v. United States, supra, Adirondack Transit Lines had been given a certificate with respect to long hauls between Paramus, New Jersey, and Monroe, New York, as well as short haul or commuter service between New York City and intermediate points between Paramus, New Jersey, and Monroe. The court set aside so much of the certificate as dealt with the short haul service, on the grounds that substantial evidence had not been presented and necessity for this phase of the service.

In L. A. Tucker Truck Lines v. United States, supra, Pemiscot truck lines was granted authority to run truck service between St. Louis and Memphis and between Memphis and Sikeston, Missouri, and Sikeston, Missouri and St. Louis. Sikeston was only one of the intermediate points between Memphis and St. Louis. The only portion of the certificate attacked was that part which dealt with the authorization of new service between Sikeston and St. Louis. The court held: "There was no evidence before the Commission to sustain the need for granting additional service between St. Louis, Missouri, and Sikeston, Missouri, nor was there showing that the present service was inadequate. While the routes over which Pemiscot Motor Freight operated

required it to pass through Sikeston in order to render service to other points farther south granted in the certificate, this in the court's opinion is no justification for granting it authority to serve Sikeston." 115 F.Supp. at page 649.

42. As the case has to be remanded to the Commission with respect to this phase, we do not undertake to set this forth in terms having the precision of a certificate. But under our holding, except for Strickland's existing authority, the applicants will not be permitted to engage in the following transportation:

(1) Service from or through Houston destined to Beaumont or any point between Houston and Beaumont, or in the reverse direction,

(2) service from or through Houston destined to Orange or any point between Houston and Orange, or in the reverse direction,

(3) service from points east of Orange-Beaumont destined to any *intermediate point between* Orange-Beaumont and Houston, or in the reverse direction. (This would not restrict, for example, a shipment from Baton Rouge to Orange or Beaumont, or the reverse.)

43. The national transportation policy is set forth in 49 U.S.C.A. preceding §§ 1, 301, 901 & 1001.

problems exist, it would be mere tautology for the Commission to repeat formal declarations in terms of the national transportation policy. Obviously the entire report with its many basic findings clearly demonstrates that the Commission applied "its familiarity with transportation problems to these conflicting considerations." American Trucking Ass'ns, Inc. v. United States, 1953, 344 U.S. 298, 314, 73 S.Ct. 307, 316, 97 L.Ed. 337.

Finally, the Commission did not abuse its discretion in denying the petition for rehearing. United States v. Pierce Auto Freight Lines, 1946, 327 U.S. 515, 534–536, 66 S.Ct. 687, 90 L.Ed. 821; Interstate Commerce Commission v. Jersey City, 1944, 322 U.S. 503, 514–518, 64 S.Ct. 1129, 88 L.Ed. 1420.

Accordingly, the order is affirmed in part and set aside in part. Insofar as the order is set aside, the matter is remanded to the Commission for further consistent proceedings.

Affirmed in part, remanded in part.